# UNITED STATES *v.* PARADISE ET AL.

No. 85–999.   Argued November 12, 1986—Decided February 25, 1987

BRENNAN, J., announced the judgment of the Court and delivered an opinion in which MARSHALL, BLACKMUN, and POWELL, JJ., joined. POWELL, J., filed a concurring opinion, *post*, p. 186. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 189. WHITE, J., filed a dissenting statement, *post*, p. 196. O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA, J., joined, *post*, p. 196.

*Solicitor General Fried* argued the cause for the United States. With him on the briefs were *Assistant Attorney General Reynolds, Deputy Solicitor General Lauber, Deputy Assistant Attorney General Carvin, Roger Clegg, Walter W. Barnett, David K. Flynn,* and *Clint Bolick.*

*J. Richard Cohen* argued the cause for respondents. With him on the brief for respondents Paradise et al. were *Morris S. Dees, Jr.,* and *Arthur Z. Lazarus, Jr. Edward L. Hardin, Jr.,* filed a brief for respondents Alabama Department of Public Safety et al. under this Court's Rule 19.6. *James S. Ward* filed a brief for respondents McClellan et al. under this Court's Rule 19.6.*

---

*\*Ronald A. Zumbrun, John H. Findley,* and *Anthony T. Caso* filed a brief for the Pacific Legal Foundation as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of New York et al. by *Robert Abrams,* Attorney General, *O. Peter Sherwood,* Solicitor General, *Lawrence S. Kahn,* Deputy Solicitor General, and *Suzanne M. Lynn, Jon C. Dubin,* and *Elvia Rosales Arriola,* Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *John K. Van de Kamp* of California, *Neil F. Hartigan* of Illinois, *William J. Guste, Jr.,* of Louisiana, *Stephen H. Sachs* of Maryland, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Charles G. Brown* of West Virginia, and *Bronson C. La Follette* of Wisconsin; for the

JUSTICE BRENNAN announced the judgment of the Court and delivered an opinion in which JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE POWELL join.

The question we must decide is whether relief awarded in this case, in the form of a one-black-for-one-white promotion requirement to be applied as an interim measure to state trooper promotions in the Alabama Department of Public Safety (Department), is permissible under the equal protection guarantee of the Fourteenth Amendment.

In 1972 the United States District Court for the Middle District of Alabama held that the Department had systematically excluded blacks from employment in violation of the Fourteenth Amendment. Some 11 years later, confronted with the Department's failure to develop promotion procedures that did not have an adverse impact on blacks, the District Court ordered the promotion of one black trooper for each white trooper elevated in rank, as long as qualified black candidates were available, until the Department implemented an acceptable promotion procedure. The United States challenges the constitutionality of this order.[1]

I

Because the Department's prior employment practices and conduct during this lawsuit bear directly on the constitution-

city of Birmingham, Alabama, by *James P. Alexander* and *James K. Baker;* for the NAACP Legal Defense & Educational Fund, Inc., by *Julius L. Chambers, Ronald L. Ellis, Eric Schnapper,* and *Clyde E. Murphy;* and for the Lawyers' Committee for Civil Rights Under Law et al. by *Robert D. Joffe, Thomas D. Barr, Robert F. Mullen, Harold R. Tyler, Jr., James Robertson, Norman Redlich, William L. Robinson, Richard T. Seymour,* and *Stephen L. Spitz.*

*Daniel B. Edelman, James R. Murphy, Charles L. Reischel, Frederick N. Merkin,* and *Robert Cramer* filed a brief for the city of Detroit et al. as *amici curiae.*

[1] The Department and its Director, Colonel Byron Prescott, and the intervenors, a class of white applicants for promotion within the Department, have filed briefs in support of the United States, but they did not themselves petition for certiorari.

ality of any race-conscious remedy imposed upon it, we must relate the tortuous course of this litigation in some detail.

## A

In 1972 the National Association for the Advancement of Colored People (NAACP) brought this action challenging the Department's longstanding practice of excluding blacks from employment. The United States was joined as a party plaintiff, and Phillip Paradise, Jr., intervened on behalf of a class of black plaintiffs. District Judge Frank M. Johnson, Jr., determined:

> "Plaintiffs have shown without contradiction that the defendants have engaged in a blatant and continuous pattern and practice of discrimination in hiring in the Alabama Department of Public Safety, both as to troopers and supporting personnel. In the thirty-seven year history of the patrol there has never been a black trooper and the only Negroes ever employed by the department have been nonmerit system laborers. This unexplained and unexplainable discriminatory conduct by state officials is unquestionably a violation of the Fourteenth Amendment." *NAACP* v. *Allen*, 340 F. Supp. 703, 705 (MD Ala. 1972).

He concluded:

> "Under such circumstances . . . the courts have the authority and the duty not only to order an end to discriminatory practices, but also to correct and eliminate the present effects of past discrimination. The racial discrimination in this instance has so permeated the Department['s] employment policies that both mandatory and prohibitory injunctive relief are necessary to end these discriminatory practices and to make some substantial progress toward eliminating their effects." *Id.*, at 705–706 (citations omitted).

As a result, the court issued an order (1972 order), enjoining the Department to hire one black trooper for each white

trooper hired until blacks constituted approximately 25% of the state trooper force.[2]  Judge Johnson also enjoined the Department from "engaging in any employment practices, including recruitment, examination, appointment, training, *promotion*, retention or any other personnel action, for the purpose or with the effect of discriminating against any employee, or actual or potential applicant for employment, on the ground of race or color."  *Id.*, at 706 (emphasis added). The court further required that "eligible and promotional registers heretofore used for the purpose of hiring troopers be and they are hereby abrogated to the extent necessary to comply with this decree."  *Id.*, at 707.[3]

The defendants appealed,[4] but the Fifth Circuit upheld the hiring requirement:

---

[2] In *United States* v. *Frazer*, 317 F. Supp. 1079 (MD Ala. 1970), Judge Johnson found that certain state agencies, including the personnel department, which supplies support staff to the department, were engaged in systematic violations of the constitutional rights of black applicants and employees.  In *NAACP* v. *Allen*, 340 F. Supp. 703 (MD Ala. 1972), the decree in *United States* v. *Frazer* was amended to require the personnel department to ensure that, until blacks constituted 25% of the Department's support personnel, 50% of the individuals hired for those positions were black.  340 F. Supp., at 706.

[3] The court awarded attorney's fees to the plaintiffs.  Judge Johnson found that the defendants "unquestionably knew and understood that their discriminatory practices violated the Fourteenth Amendment" and that, as a consequence, "their defense of th[e] lawsuit amount[ed] to unreasonable and obdurate conduct which necessitated the expense of litigation."  *Id.*, at 708.

[4] While the appeal was pending, the Court of Appeals ordered the District Judge to supplement the record and to reconsider his decree.  After discovery, Judge Johnson decided not to alter his order.  He explicitly compared the results achieved by the injunction prohibiting discrimination in *United States* v. *Frazer*, *supra*, and the hiring order in *NAACP* v. *Allen*, *supra:*

"The contrast in results achieved to this point in the *Allen* case and the *Frazer* case under the two orders entered in those cases is striking indeed.  Even though the agencies affected by the *Frazer* order and the Department of Public Safety draw upon the same pool of black applicants — that is, those who have been processed through the Department of Person-

"The use of quota relief in employment discrimination cases is bottomed on the chancellor's duty to eradicate the continuing effects of past unlawful practices. By mandating the hiring of those who have been the object of discrimination, quota relief promptly operates to change the outward and visible signs of yesterday's racial distinctions and thus, to provide an impetus to the process of dismantling the barriers, psychological or otherwise, erected by past practices. It is a temporary remedy that seeks to spend itself as promptly as it can by creating a climate in which objective, neutral employment criteria can successfully operate to select public employees solely on the basis of job-related merit." *NAACP* v. *Allen,* 493 F. 2d 614, 621 (1974).

The Court of Appeals also held that white applicants who had higher eligibility rankings than blacks were not denied due process or equal protection of the laws by the one-for-one hiring order. The Department's use of unvalidated selection procedures that disproportionately excluded blacks precluded any argument that "quota hiring produces unconstitutional 'reverse' discrimination, or a lowering of employment standards, or the appointment of less or unqualified persons." *Id.,* at 618.[5]

In 1974, only shortly after the Court of Appeals' decision, the plaintiffs found it necessary to seek further relief from the District Court. Judge Johnson found that "defendants have, for the purpose of frustrating or delaying full relief to the plaintiff class, artificially restricted the size of the trooper

---

nel—*Allen* has seen substantial black hiring, while the progress under *Frazer* has been slow and, in many instances, nonexistent. . . .

"[T]his Court's experience reflects that the decrees that are entered must contain hiring goals; otherwise effective relief will not be achieved." *United States* v. *Dothard,* 373 F. Supp. 504, 506–507 (MD Ala.), aff'd *sub nom. NAACP* v. *Allen,* 493 F. 2d 614 (CA5 1974).

[5] None of the parties sought certiorari review of the Court of Appeals' determination that the 50% hiring quota at issue was constitutional.

force and the number of new troopers hired." *Paradise* v. *Dothard*, Civ. Action No. 3561–N (MD Ala., Aug. 5, 1975). The court also addressed the disproportionate failure of blacks hired to achieve permanent trooper status:[6]

> "[T]he high attrition rate among blacks resulted from the selection of other than the best qualified blacks from the eligibility rosters, some social and official discrimination against blacks at the trooper training academy, preferential treatment of whites in some aspects of training and testing, and discipline of blacks harsher than that given whites for similar misconduct while on the force." *Ibid.*

The court reaffirmed the 1972 hiring order, enjoining any further attempts by the Department to delay or frustrate compliance.

### B

In September 1977 the plaintiffs again had to return to the District Court for supplemental relief, this time specifically on the question of the Department's *promotion* practices. Following extensive discovery, the parties entered into a partial consent decree (1979 Decree), approved by the court in February 1979.[7]  In this decree, the Department agreed to develop within one year a promotion procedure that would be fair to all applicants and have "little or no adverse impact upon blacks seeking promotion to corporal." App. 40.  In the decree, the Department also agreed that the promotion procedure would conform with the 1978 Uniform Guidelines

---

[6] At this time, 40 blacks had been hired as a result of the 1972 District Court order; only 27 remained on the force.  All 29 whites hired during the same period had retained their positions.  *Paradise* v. *Dothard*, Civ. Action No. 3561–N (MD Ala., Aug. 5, 1975).

[7] Judge Johnson presided in this litigation until he assumed his position on the former Fifth Circuit in 1979.  At that time, the case was transferred to District Judge Varner; subsequently, it was reassigned to Judge Myron Thompson in October 1980.

on Employee Selection Procedures, 28 CFR § 50.14 (1978).[8] Once such a procedure was in place for the rank of corporal, the decree required the defendants to develop similar procedures for the other upper ranks — sergeant, lieutenant, captain, and major. The decree expressly provided that the plaintiffs might apply to the court for enforcement of its terms or for other appropriate relief. App. 41.[9]

Five days after approval of the 1979 Decree, the defendants sought clarification of the 1972 *hiring* order. The Department maintained that its goal — a 25% black trooper force — applied only to officers in entry-level positions and not to the upper ranks. The court responded:

> "On this point, there is no ambiguity. The Court's [1972] order required that one-to-one hiring be carried out until approximately twenty-five percent of the *state trooper force* is black. It is perfectly clear that the order did not distinguish among troopers by rank." *Paradise* v. *Shoemaker*, 470 F. Supp. 439, 440 (MD Ala. 1979) (emphasis in original).

The Department also argued that because the 25% objective could not be achieved unless 37.5% of entry-level positions were held by blacks, "more qualified white applicants" were passed over than was constitutionally permissible. *Id.*, at 441. The District Court rejected the argument, stating:

> "To modify this order would be to do less than the law requires, which is to eradicate the continuing effects of past unlawful practices. In 1972, defendants were not just found guilty of discriminating against blacks in hir-

---

[8] The Uniform Guidelines are "designed to provide a framework for determining the proper use of tests and other [employee] selection procedures consistent with Federal law." 28 CFR § 50.14, pt. 1, § 1 (1978).

[9] In the interim the parties agreed to utilize the existing state merit system for promotions to the rank of corporal, provided that at least three black troopers were promoted. The details of this procedure were set forth in an "Agreement of Counsel for the Parties." App. 46.

ing to entry-level positions. The Court found that in thirty-seven years there had never been a black trooper *at any rank. One continuing effect of that discrimination is that, as of November 1, 1978, out of 232 state troopers at the rank of corporal or above, there is still not one black.* The [hiring] quota fashioned by the Court provides an impetus to promote blacks into those positions. To focus only on the entry-level positions would be to ignore that past discrimination by the Department was pervasive, that its effects persist, and that they are manifest. . . . The order in this case is but the necessary remedy for an intolerable wrong." *Id.,* at 442 (emphasis added).

In April 1981, more than a year after the deadline set in the 1979 Decree, the Department proposed a selection procedure for promotion to corporal and sought approval from the District Court. The United States and the plaintiff class both objected to implementation of the procedure, arguing that it had not been validated and that its use would be impermissible if it had an adverse impact on blacks. To resolve this dispute the parties executed a second consent decree (1981 Decree) which the District Court approved on August 18, 1981.

In the 1981 Decree, the Department reaffirmed its commitment made in 1979 to implement a promotion procedure with little or no adverse impact on blacks. The parties then agreed to the administration of the proposed promotion procedure and that its results would be "reviewed to determine whether the selection procedure has an adverse impact against black applicants." App. 51. Whether there was adverse impact was to be determined by reference to the "four-fifths" rule of § 4 of the Uniform Guidelines. See 28 CFR § 50.14 (1978).[10] If the parties proved unable to agree on

---

[10] According to § 4 of the Uniform Guidelines, "[a] selection rate for any racial, ethnic or sex group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally

a procedure, its determination would be submitted to the District Court. No promotions would occur until the "parties . . . agreed in writing or the Court . . . ruled upon the method to be used for making promotions with little or no adverse impact." App. 53.

The defendants administered the test to 262 applicants of whom 60 (23%) were black. Of the 60 blacks who took the test, only 5 (8.3%) were listed in the top half of the promotion register; the highest ranked black candidate was number 80. *Id.*, at 119. In response to an inquiry from the United States, the Department indicated that there was an immediate need to make between 8 and 10 promotions to corporal and announced its intention to elevate between 16 and 20 individuals before construction of a new list. 1 Record 222.

The United States objected to any rank-ordered use of the list, stating that such use "would result in substantial adverse impact against black applicants" and suggested that the defendants submit an alternative proposal that would comply with the requirements of the 1979 and 1981 Decrees. *Id.*, at 220–221. No proposal was submitted, and no promotions were made during the next nine months.

In April 1983, plaintiffs returned to District Court and sought an order enforcing the terms of the two consent decrees. Specifically, they requested that defendants be required to *promote* blacks to corporal "at the same rate at which they have been hired, 1 for 1, until such time as the defendants implement a valid promotional procedure." *Id.*, at 112. The plaintiff class contended that such an order would "encourage defendants to develop a valid promotional procedure as soon as possible," and would "help to alleviate the gross underrepresentation of blacks in the supervisory

---

be regarded as evidence of adverse impact." 28 CFR § 50.14, pt. 1, § 4 (1978). In other words, if 60% of the white troopers who take a promotion test pass it, then 48% of the black troopers to whom it is administered must pass.

ranks of the Department"[11]—an underrepresentation caused by the Department's past discrimination and exacerbated by its continuing refusal to implement a fair procedure. *Ibid.*

Although it opposed the one-for-one promotion requirement, the United States agreed that the consent decrees should be enforced. It stated that defendants had failed to offer "any reason[s] why promotions should not be made," nor had they offered an explanation as to why they had halted "progress towards remedying the effects of past discrimination." *Id.*, at 199–201. The United States further observed that the Department's failure to produce a promotion plan in compliance with the 1979 and 1981 Decrees "suggests that a pattern of discrimination against blacks in the Department . . . may be continuing." *Id.*, at 200.[12]

After the motion to enforce was filed, four white applicants for promotion to corporal sought to intervene on behalf of a class composed of those white applicants who took the proposed corporal's examination and ranked number 1 through number 79. App. 81–87. They argued that the 1979 and 1981 Decrees and the relief proposed by the plaintiffs in their motion to enforce were "unreasonable, illegal, unconstitutional or against public policy." *Id.*, at 99.

In an order entered October 28, 1983, the District Court held that the Department's selection procedure had an adverse impact on blacks. *Paradise* v. *Prescott*, 580 F. Supp. 171, 174 (MD Ala.).[13] Observing that even if 79 corporals

---

[11] In fact, the only black candidates who had been promoted since 1972 were the four promoted pursuant to the counsels' sidebar to the 1979 Decree. See n. 9, *supra.*

[12] The Department opposed the motion to enforce, arguing that the relief sought by the plaintiffs was unconstitutional. The Department requested an opportunity to demonstrate that the proposed procedure was valid and that it did not adversely impact upon black candidates within the meaning of the consent decrees and the Uniform Guidelines.

[13] In a separate order issued that same day, the District Court permitted the white intervenors to participate in the case on a prospective basis only. The court held that intervention was untimely as to prior orders, judgments, and decrees. App. 116.

were promoted in rank order, rather than the 15 contemplated, none would be black, the court concluded that "[s]hort of outright exclusion based on race, it is hard to conceive of a selection procedure which would have a greater discriminatory impact." *Id.*, at 173.[14] The Department was ordered to submit, by November 10, 1983, "a plan to promote to corporal, from qualified candidates, at least 15 persons in a manner that will not have an adverse racial impact." *Id.*, at 175.

The Department subsequently submitted a proposal to promote 15 persons to the rank of corporal, of whom 4 would be black. In addition, the Department requested that the department of personnel be given more time to develop and submit for court approval a nondiscriminatory promotion procedure.

The United States did not oppose the Department's proposal, but the plaintiffs did. They argued that the proposal "totally disregards the injury plaintiffs have suffered due to the defendants' four-and-a-half year delay [since the 1979 Decree] and fails to provide any mechanism that will insure the present scenario will not reoccur." 2 Record 382.

On December 15, 1983, the District Court granted the plaintiffs' motion to enforce the 1979 and 1981 Decrees. *Paradise* v. *Prescott*, 585 F. Supp. 72 (MD Ala.). Confronted with the Department's immediate need to promote 15 troopers to corporal and the parties' inability to agree, the court was required by the 1979 and 1981 Decrees to fashion a promotion procedure. The District Judge summarized the situation:

> "On February 10, 1984, less than two months from today, twelve years will have passed since this court condemned the racially discriminatory policies and practices of the Alabama Department of Public Safety. Never-

---

[14] The District Court also rejected the Department's argument that the one-for-one hiring order was a "special program" within the meaning of the Uniform Guidelines that would insulate the Department from any finding of adverse impact in its promotion procedures. 580 F. Supp., at 174.

theless, the effects of these policies and practices remain pervasive and conspicuous at all ranks above the entry-level position. Of the 6 majors, *there is still not one black*. Of the 25 captains, *there is still not one black*. Of the 35 lieutenants, *there is still not one black*. Of the 65 sergeants, *there is still not one black*. Of the 66 corporals, *only four are black*. Thus, the department *still* operates an upper rank structure in which almost every trooper obtained his position through procedures that totally excluded black persons. Moreover, the department is *still* without acceptable procedures for advancement of black troopers into this structure, and it does not appear that any procedures will be in place within the near future. The preceding scenario is intolerable and must not continue. The time has now arrived for the department to take affirmative and substantial steps to open the upper ranks to black troopers." *Id.*, at 74 (emphasis in original).

The court then fashioned the relief at issue here. It held that "for a period of time," at least 50% of the promotions to corporal must be awarded to black troopers, if qualified black candidates were available. The court also held that "if there is to be within the near future an orderly path for black troopers to enter the upper ranks, any relief fashioned by the court must address the department's delay in developing acceptable promotion procedures for all ranks." *Id.*, at 75. Thus, the court imposed a 50% promotional quota in the upper ranks, but only *if* there were qualified black candidates, *if* the rank were less than 25% black, and *if* the Department had not developed and implemented a promotion plan without adverse impact for the relevant rank. The court concluded that the effects of past discrimination in the Department "will not wither away of their own accord" and that "without promotional quotas the continuing effects of this discrimination cannot be eliminated." *Id.*, at 75 and 76. The court highlighted the temporary nature and flexible

design of the relief ordered, stating that it was "specifically tailored" to eliminate the lingering effects of past discrimination, to remedy the delayed compliance with the consent decrees, and to ensure prompt implementation of lawful procedures. *Ibid.*

Finally, the Department was ordered to submit within 30 days a schedule for the development of promotion procedures for all ranks above the entry level. The schedule was to be "based upon realistic expectations" as the court intended that "the use of the quotas . . . be a one-time occurrence." *Ibid.* The District Court reasoned that, under the order it had entered, the Department had "the prerogative to end the promotional quotas at any time, simply by developing acceptable promotion procedures." *Id.*, at 76.

Numerous motions for reconsideration of the court's order and for the alteration or amendment of the court's judgment were denied by the District Court. In its motion, the Department set forth the "new contention" that it was "without legal authority and sufficiently trained personnel to design any promotional procedures" because "this function is allocated by statute to the Department of Personnel." *Paradise* v. *Prescott,* Civ. Action No. 3561–N (MD Ala., Jan. 13, 1984). The District Court responded that the Department had signed consent decrees in 1979 and 1981 mandating development of an acceptable procedure and that Department counsel had represented at the January 5, 1984, hearing that "it was anticipated that the development of these procedures would take only a few months." *Ibid.* The judge concluded:

> "It is now years later and this court will not entertain the excuse that the department is now without legal authority to meet its obligations under the consent decrees. . . . [T]he Department of Personnel, which is also a party to these proceedings, assured the court at the January 5, [1984] hearing that it would work closely with the Public Safety Department to develop acceptable promotion

procedures. The Public Safety Department's contention that it is without legal authority is not only meritless, it is frivolous.

"Moreover, that the Department of Public Safety would even advance this argument *dramatically demonstrates the need for the relief imposed by this court. Such frivolous arguments serve no purpose other than to prolong the discriminatory effects of the department's 37-year history of racial discrimination.*" *Ibid.* (emphasis added).

In February 1984, the Department promoted eight blacks and eight whites to corporal pursuant to the District Court's order enforcing the consent decrees.

Four months later, the Department submitted for the court's approval its proposed procedure for promotions to the rank of corporal. The District Court ruled that the Department could promote up to 13 troopers utilizing this procedure and suspended application of the one-for-one requirement for that purpose. App. 163–164. In October 1984, following approval of the Department's new selection procedure for promotion to sergeant, the court similarly suspended application of the quota at that rank. *Id.*, at 176–177.[15]

On appeal the Court of Appeals for the Eleventh Circuit affirmed the District Court's order. The Court of Appeals concluded that the relief at issue was designed to remedy the present effects of past discrimination—"effects which, as the history of this case amply demonstrates, 'will not wither away of their own accord.'" *Paradise* v. *Prescott*, 767 F. 2d 1514, 1533 (1985) (quoting 585 F. Supp., at 75). In addition, the relief awarded was deemed to "exten[d] no further than necessary to accomplish the objective of remedying the 'egre-

---

[15] In addition, the Department has been permitted to promote only white troopers to lieutenant and captain because no blacks have qualified, as of yet, for promotion to those ranks. *Paradise* v. *Prescott*, 767 F. 2d 1514, 1538, n. 19 (CA11 1985).

gious' and longstanding racial imbalances in the upper ranks of the Department." 767 F. 2d, at 1532–1533.

We granted certiorari. 478 U. S. 1019 (1986). We affirm.

## II

The United States maintains that the race-conscious relief ordered in this case violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.[16]

It is now well established that government bodies, including courts, may constitutionally employ racial classifications essential to remedy unlawful treatment of racial or ethnic groups subject to discrimination. See *Sheet Metal Workers* v. *EEOC*, 478 U. S. 421, 480 (1986), and cases cited therein. See also *Wygant* v. *Jackson Board of Education*, 476 U. S. 267, 286 (1986) ("The Court is in agreement that . . . remedying past or present racial discrimination . . . is a sufficiently weighty state interest to warrant the remedial use of a carefully constructed affirmative action program") (O'CONNOR, J., concurring in part and concurring in judgment). But although this Court has consistently held that some elevated level of scrutiny is required when a racial or ethnic distinction is made for remedial purposes, it has yet to reach consensus on the appropriate constitutional analysis.[17] We need not do

---

[16] The Government framed the issue presented as "[w]hether the one-black-for-one-white promotion quota adopted by the district court . . . is permissible under the equal protection guarantees of the Fourteenth and Fifth Amendments to the United States Constitution." Brief for United States I. Because the reach of the equal protection guarantee of the Fifth Amendment is coextensive with that of the Fourteenth, we need not decide whether the race-conscious relief ordered in this case would violate the former as well as the latter constitutional provision.

[17] See *Wygant* v. *Jackson Board of Education*, 476 U. S. 267, 274 (1986) (opinion of POWELL, J.) (the means chosen must be "narrowly tailored" to achieve a "compelling government interest"); *id.*, at 285 (O'CONNOR, J., concurring) (same); *id.*, at 301–302 (MARSHALL, J., dissenting, joined by BRENNAN, J. and BLACKMUN, J.) (remedial use of race permissible if it

so in this case, however, because we conclude that the relief ordered survives even strict scrutiny analysis: it is "narrowly tailored" to serve a "compelling [governmental] purpose." *Id.*, at 274 (opinion of POWELL, J.).

The Government unquestionably has a compelling interest in remedying past and present discrimination by a state actor. See *ibid.; id.*, at 286 (O'CONNOR, J., concurring); *Sheet Metal Workers, supra,* at 480 (opinion of BRENNAN, J.). See also *Franks* v. *Bowman Transportation Co.,* 424 U. S. 747, 763 (1976) (prevention and remedying of racial discrimination and its effects is a national policy of "highest priority"). In 1972 the District Court found, and the Court of Appeals affirmed, that for almost four decades the Department had excluded blacks from all positions, including jobs in the upper ranks. Such egregious discriminatory conduct was "unquestionably a violation of the Fourteenth Amendment." *NAACP* v. *Allen,* 340 F. Supp., at 705. As the United States concedes, Brief for United States 21, the pervasive, systematic, and obstinate discriminatory conduct of the Department created a profound need and a firm justification for the race-conscious relief ordered by the District Court.[18]

---

serves "'important governmental objectives'" and is "'substantially related to achievement of those objectives'") (quoting *University of California Regents* v. *Bakke,* 438 U. S. 265, 359 (1978)); 476 U. S., at 313 (STEVENS, J., dissenting) (both public interest served by racial classification and means employed must justify adverse effects on the disadvantaged group); *Fullilove* v. *Klutznick,* 448 U. S. 448, 507 (1980) (POWELL, J., concurring) (expressing concern first articulated in *Bakke, supra,* at 362, that review not be "'strict' in theory and fatal in fact").

[18] *Amici,* the city of Birmingham, the city of Detroit, the city of Los Angeles, and the District of Columbia, state that the operations of police departments are crippled by the lingering effects of past discrimination. They believe that race-conscious relief in hiring and promotion restores community trust in the fairness of law enforcement and facilitates effective police service by encouraging citizen cooperation. See also *Wygant, supra,* at 314 (STEVENS, J., dissenting) ("[I]n a city with a recent history of racial unrest, the superintendent of police might reasonably conclude that

The Department and the intervenors, however, maintain that the Department was found guilty only of discrimination in hiring, and not in its promotional practices. They argue that no remedial relief is justified in the promotion context because the intentional discrimination in hiring was without effect in the upper ranks, and because the Department's promotional procedure was not discriminatory. There is no merit in either premise.

Discrimination at the entry level necessarily precluded blacks from competing for promotions, and resulted in a departmental hierarchy dominated exclusively by nonminorities. The lower courts determined that this situation was explicable only by reference to the Department's past discriminatory conduct.[19] In 1972 the Department was "not just found guilty of discriminating against blacks in hiring to entry-level positions. The court found that in 37 years there had never been a black trooper at any rank." *Paradise* v.

---

an integrated police force could develop a better relationship with the community and do a more effective job of maintaining law and order than a force composed only of white officers"); *NAACP* v. *Allen,* 493 F. 2d, at 621 ("This is a police department and the visibility of the Black patrolman in the community is a decided advantage for all segments of the public at a time when racial divisiveness is plaguing law enforcement" (citation omitted)). *Amicus* NAACP Legal Defense and Educational Fund, Inc., suggests that the governmental interest in a racially integrated Department is amplified here due to community perceptions of, and reactions to the Department's historical role in defense of segregation and its active opposition to the civil rights movement. We need not decide if either the generalized governmental interest in effective law enforcement or the more particularized need to overcome any impediments to law enforcement created by perceptions arising from the egregious discriminatory conduct of the Department is compelling. In this case the judicial determinations of prior discriminatory policies and conduct satisfy the first prong of the strict scrutiny test.

[19] Compare this situation with that described in *Wygant, supra,* at 276 (opinion of POWELL, J.) ("There are numerous explanations for a disparity between the percentage of minority students and the percentage of minority faculty, many of them completely unrelated to discrimination of any kind").

*Shoemaker*, 470 F. Supp., at 442. In 1979 the District Judge stated that one continuing effect of the Department's historical discrimination was that, "as of November 1, 1978, out of 232 state troopers at the rank of corporal or above, *there is still not one black.*" *Ibid.* The court explained that the *hiring* quota it had fashioned was intended to provide "an impetus to promote blacks into those positions" and that "[t]o focus only on the entry-level positions would be to ignore that past discrimination by the Department was pervasive, that its effects persist, and that they are manifest." *Ibid.* The District Court crafted the relief it did due to "the department's failure after almost twelve years to eradicate the continuing effects of its own discrimination." 585 F. Supp., at 75, n. 1. It is too late for the Department to attempt to segregate the results achieved by its hiring practices and those achieved by its promotional practices.

The argument that the Department's promotion procedure was not discriminatory is belied by the record. In 1979, faced with additional allegations of discrimination, the Department agreed to adopt promotion procedures without an adverse impact on black candidates within one year. See 767 F. 2d, at 1532. By 1983 the Department had promoted only four blacks, and these promotions had been made pursuant to the 1979 Decree, and "not the voluntary action of the Department." *Id.*, at 1533, n. 16. In December 1983, the District Court found, despite the commitments made in the consent decrees, that the Department's proposed promotion plan would have an adverse impact upon blacks, 580 F. Supp., at 174, and that "the department *still* operate[d] an upper rank structure in which almost every trooper obtained his position through procedures that totally excluded black persons." 585 F. Supp., at 74 (emphasis in original). On appeal, the Eleventh Circuit summarily rejected the argument of the Department and the intervenors:

"[I]t is no answer in this case to say that plaintiffs have not proven that the Department has discriminated

against blacks above the entry-level seeking promotions. . . . [I]t cannot be gainsaid that white troopers promoted *since 1972* were the specific beneficiaries of *an official policy which systematically excluded all blacks."* 767 F. 2d, at 1533, n. 16 (emphasis added).

Promotion, like hiring, has been a central concern of the District Court since the commencement of this action; since 1972, the relief crafted has included strictures against promotion procedures that have a discriminatory purpose or effect. The race-conscious relief at issue here is justified by a compelling interest in remedying the discrimination that permeated entry-level hiring practices and the promotional process alike.[20]

Finally, in this case, as in *Sheet Metal Workers,* 478 U. S., at 485 (POWELL, J., concurring in part and concurring in judgment), the District Court's enforcement order is "supported not only by the governmental interest in eradicating [the Department's] discriminatory practices, it is also supported by the societal interest in compliance with the judgments of federal courts." The relief at issue was imposed upon a defendant with a consistent history of resistance to

_____

[20] We also reject the argument of the United States, the Department, and the intervenors that the purpose of the order enforcing the consent decrees was the imposition of a particular racial balance on the upper ranks of the Department. The one-for-one mechanism was employed not to punish the Department's failure to achieve racial balance, but to remedy the Department's refusal to fulfill the commitment made in the consent decrees to implement a promotion procedure without adverse impact on blacks and to eradicate the effects of its past delay and discrimination. The racial imbalances in the Department are properly characterized as the effects of the Department's past discriminatory actions and of its failure to develop a promotion procedure without adverse impact as required by the previous court orders and the consent decrees. Cf. *Sheet Metal Workers* v. *EEOC,* 478 U. S. 421, 487 (1986) (POWELL, J., concurring in part and concurring in judgment) ("The contempt order was not imposed for the Union's failure to achieve the goal, but for its failure to take the prescribed steps that would facilitate achieving the goal").

the District Court's orders, and only *after* the Department failed to live up to its court-approved commitments.

## III

While conceding that the District Court's order serves a compelling interest, the Government insists that it was not narrowly tailored to accomplish its purposes — to remedy past discrimination and eliminate its lingering effects, to enforce compliance with the 1979 and 1981 Decrees by bringing about the speedy implementation of a promotion procedure that would not have an adverse impact on blacks, and to eradicate the ill effects of the Department's delay in producing such a procedure. We cannot agree.

In determining whether race-conscious remedies are appropriate, we look to several factors, including the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties. *Sheet Metal Workers*, 478 U. S., at 481 (opinion of BRENNAN, J.); *id.*, at 486 (POWELL, J., concurring in part and concurring in judgment). When considered in light of these factors, it was amply established, and we find that the one-for-one promotion requirement was narrowly tailored to serve its several purposes, both as applied to the initial set of promotions to the rank of corporal and as a continuing contingent order with respect to the upper ranks.

## A

To evaluate the District Court's determination that it was *necessary* to order the promotion of eight whites and eight blacks to the rank of corporal at the time of the motion to enforce, we must examine the purposes the order was intended to serve. First, the court sought to eliminate the effects of the Department's "long term, open, and pervasive" discrimination, including the absolute exclusion of blacks from

its upper ranks. Second, the judge sought to ensure expeditious compliance with the 1979 and 1981 Decrees by inducing the Department to implement a promotion procedure that would not have an adverse impact on blacks. Finally, the court needed to eliminate so far as possible the effects of the Department's delay in producing such a procedure. Confronted by the Department's urgent need to promote at least 15 troopers to corporal, see *Paradise* v. *Prescott*, 580 F. Supp., at 173, the District Court determined that all of its purposes could be served only by ordering the promotion of eight blacks and eight whites, as requested by the plaintiff class.

The options proffered by the Government and the Department would not have served the court's purposes. The Department proposed, as a stopgap measure, to promote 4 blacks and 11 whites and requested additional time to allow the department of personnel to develop and submit a non-discriminatory promotion procedure. The United States argues that the Department's proposal would have allowed this round of promotions to be made without adverse impact on black candidates.

The Department's proposal was inadequate because it completely failed to address two of the purposes cited above. The Department's ad hoc offer to make one round of promotions without an adverse impact ignored the court's concern that an acceptable procedure be adopted with alacrity. As early as 1972, the Department had been enjoined from engaging in any promotional practices "for the purpose or with the effect of discriminating against any employee . . . on the ground of race or color." *NAACP* v. *Allen*, 340 F. Supp., at 706. In 1979, the Department had promised in a court-approved consent decree to develop and implement a *procedure* without adverse impact by 1980. By 1983, such a procedure still had not been established, and Paradise sought enforcement of the consent decrees. Given the record of delay, we find it astonishing that the Department should sug-

gest that in 1983 the District Court was constitutionally required to settle for yet another promise that such a procedure would be forthcoming "as soon as possible." 2 Record 358.

Moreover, the Department's proposal ignored the injury to the plaintiff class that resulted from its delay in complying with the terms of the 1972 order and the 1979 and 1981 Decrees.[21] As the Eleventh Circuit pointed out, no blacks were promoted between 1972 and 1979; the four blacks promoted in 1979 were elevated pursuant to the 1979 Decree and not as a result of the voluntary action of the Department; and, finally, the whites promoted *since 1972* "were the specific beneficiaries of an official policy which systematically excluded all blacks." 767 F. 2d, at 1533, n. 16. To permit ad hoc decisionmaking to continue and allow only 4 of 15 slots to

---

[21] The Government contends that "the Department in reality had acted with reasonable diligence to devise a new corporal's examination" and that both Paradise and the District Judge "failed to appreciate how difficult it is to develop and implement selection procedures that satisfy the rigorous standards of the *Uniform Guidelines*" because "the validation of selection procedures is an expensive and time-consuming process usually extending over several years" and because the tests, besides being validated, had to be without adverse impact. Brief for United States 24–25, n. 13.

This argument is without merit. Since the District Court order at issue here was rendered, the Department has timely proposed and the court has tentatively approved, procedures for promotion to corporal and sergeant. App. 163–164, 176–177. Although these procedures have not yet been validated (and, according to the Government, may not be for some time, Tr. of Oral Arg. 41–42), the use of the one-for-one promotion requirement was suspended by the court both times the Department proposed a procedure that appeared to be without adverse impact. It is therefore clear that any inevitable delay in validating the procedures will not result in reimposition of the one-for-one requirement so long as the Department implements a procedure without apparent adverse impact. The difficulties of validating a procedure do not excuse the Department's delay in developing a test without adverse impact.

In addition, it was the Department that initially proposed to implement a validated procedure within one year; this time period was not imposed by the court. Surely the Department was in the best position to assess the practicality of its own proposal.

be filled by blacks would have denied relief to black troopers who had irretrievably lost promotion opportunities.[22]  Thus, adoption of the Department's proposal would have fallen far short of the remedy necessary to eliminate the effects of the Department's past discrimination, would not have ensured adoption of a procedure without adverse impact, and would not have vitiated the effects of the defendant's delay.[23]

The Government suggests that the trial judge could have imposed heavy fines and fees on the Department pending compliance.  This alternative was never proposed to the District Court.  Furthermore, the Department had been ordered to pay the plaintiffs' attorney's fees and costs throughout this lengthy litigation; these court orders had done little

---

[22] JUSTICE O'CONNOR's dissent suggests that the District Court's order could not have been intended to eradicate the effects of the Department's delay since it was suspended once the Department developed a promotion procedure that did not have an adverse impact on blacks.  *Post*, at 197–198.  But JUSTICE O'CONNOR's dissent overlooks that the District Court balanced its several goals, none of which was permitted to dominate at the expense of the others.  The court ordered the immediate promotion of eight blacks to the rank of corporal, eliminating in part the ill effect of the Department's past delay, and required further promotions of qualified blacks, indicating its willingness to *order* such promotions unless the Department implemented a fair promotion procedure.  The court's order was carefully constructed to ensure that some qualified black candidates would be promoted immediately and that other promotions would follow in the near future, preferably by a procedure of the Department's own design. The conditional or limited nature of the remedial order does not raise doubts about whether the District Court intended to eliminate so far as possible the effects of past delay and discrimination; rather it reveals that the District Court sought to achieve this goal while interfering as little as possible with the rights of nonminority troopers.

[23] The merit of the District Court's determination in 1983 that it could not accept the Department's promise to develop a promotion procedure without adverse impact is illustrated by the Department's petition for reconsideration of the court's order enforcing the consent decrees. · The Department argued that it was without legal authority to comply with the court's order; the District Court stated that this argument was yet another delaying tactic.  See *supra*, at 164–165, and App. 139.

to prevent future foot-dragging.[24]   See, *e. g.*, *United States* v. *Frazer*, 317 F. Supp. 1079, 1093 (1970); *NAACP* v. *Allen*, 340 F. Supp., at 708–710.   In addition, imposing fines on the defendant does nothing to compensate the plaintiffs for the long delays in implementing acceptable promotion procedures.   Finally, the Department had expressed an immediate and urgent need to make 15 promotions, and the District Court took this need into consideration in constructing its remedy.[25]   As we observed only last Term, "a district court may find it necessary to order interim hiring or promotional goals pending the development of nondiscriminatory hiring or promotion procedures.   In these cases, the use of numerical goals provides a compromise between unacceptable alterna-

---

[24] Indeed, the Department had shown itself willing to sacrifice a great deal of money to avoid the court's orders.   See *Paradise* v. *Dothard*, Civ. Action No. 3561–N (MD Ala., Aug. 5, 1975) ("The evidence outlined above establishes and this Court now finds that, at the time of and in the years following the Court's 1972 order, the administration and the heads of the Department of Public Safety perceived a need for additional troopers—a need characterized as critical; that there were appropriated and available to the defendants funds in excess of $3 million, a substantial portion of which could have been used for salaries and ancillary expenses for new troopers; and that this money was not spent for the critically needed additional troopers but went unspent or was diverted to other uses.   These findings, when combined with the considerable testimony regarding the defendants' reluctance to implement the Court's remedial order by placing black troopers on the state's highways, necessitate the conclusion that the defendants have, for the purpose of frustrating or delaying full relief to the plaintiff class, artificially restricted the size of the trooper force and the number of new troopers hired").

[25] Fining the defendant lacks even the lone virtue of the Department's proposal to promote four blacks: that at least a step would be taken toward the eradication of past discrimination by elevating blacks in the hierarchy. Furthermore, it does nothing to compensate plaintiffs for the past and future delay in implementation of procedures without adverse effect.   While fines vindicate the court's authority, here they would not fulfill the court's additional responsibility to "eliminate the discriminatory effects of the past as well as bar like discrimination in the future."   *Louisiana* v. *United States*, 380 U. S. 145, 154 (1965).

tives: an outright ban on hiring or promotions . . . [or] continued use of a discriminatory selection procedure," or, we might add, use of no selection procedure at all.[26]

By 1984 the District Court was plainly justified in imposing the remedy chosen. Any order allowing further delay by the Department was entirely unacceptable. Cf. *Green* v. *New Kent County School Board*, 391 U. S. 430, 438, 439 (1968) ("[A] plan that at this late date fails to provide meaningful assurance of prompt and effective disestablishment of a dual system is . . . intolerable. . . . The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now*"). Not only was the immediate promotion of blacks to the rank of corporal essential, but, if the need for continuing judicial oversight was to end, it was also essential that the Department be required to develop a procedure without adverse impact on blacks, and that the effect of past delays be eliminated.[27]

---

[26] The United States also suggests that the District Court could have made the promotion decisions itself or appointed a trustee to supervise the Department's progress. Again neither of these alternatives were proposed to the judge. The suggestions appear rather beside the point as the United States would presumably object if the District Court or the trustee simply selected 50% blacks to be promoted each time vacancies occurred until a test without adverse impact was created, rather than ordering the Department to select 50% blacks. If the United States is actually suggesting that the court come up with an ad hoc proposal for each batch of promotions, this solution is subject to the same deficiencies noted with respect to the Department's proposal to the court. See *supra*, at 172–173.

[27] The imposition of the District Court's requirement with respect to the ranks beyond corporal was also clearly justified. At the time the District Court imposed the corporal-promotion ratio, it had required the Department to submit for its approval a schedule for the development of promotion procedures for all ranks above the entry-level position "based upon realistic expectations." *Paradise* v. *Prescott*, 585 F. Supp. 72, 75 (MD Ala. 1983). The Department complied, proposing periods of time ranging from 5 months for the position of corporal to 24 months for the position of major. 2 Record 569–570. Thus far, all procedures have been submitted in a timely manner preventing any imposition of the one-for-one requirement in

We conclude that in 1983, when the District Judge entered his order, "it is doubtful, given [the Department's] history in this litigation, that the District Court had available to it any other effective remedy." *Sheet Metal Workers*, 478 U. S., at 486 (POWELL, J., concurring in part and concurring in judgment).[28]

## B

The features of the one-for-one requirement and its actual operation indicate that it is flexible in application at all ranks. The requirement may be waived if no qualified black candidates are available. The Department has, for example, been permitted to promote only white troopers to the ranks of lieutenant and captain since no black troopers have qualified for those positions. Further, it applies only when the Depart-

___

the upper ranks. The record indicates that, while the order itself is a continuing one, its application is entirely contingent on the repetition of the exact circumstances that prompted its initial formulation. The District Court will resort to the quota again only if confronted with further delay by the Department in implementing a neutral promotion procedure according to the schedule the Department itself proposed. Thus, any future use of the one-for-one requirement will be lawful for the same reason that justified the District Judge in ordering the promotion of eight blacks and eight whites to the rank of corporal: only in the event the Department fails to meet its court-approved commitments. We cannot anticipate that this will occur.

[28] JUSTICE O'CONNOR's dissent states that the District Court's order was issued "after no evident consideration of the available alternatives," *post*, at 201, and asserts that a trustee could have been appointed to develop an acceptable promotion procedure or that a combination of other penalties could have been imposed, achieving the same results without the imposition of race-conscious relief. Again we note that these "alternatives" were never proposed to the court. And, although we will not repeat the history detailed, *supra*, at 153–166, we think JUSTICE O'CONNOR's dissent overlooks the District Judge's patient accommodation of the Department's asserted needs and the long history of recalcitrance that preceded the race-conscious order. Finally, as noted in text, *supra*, at 173–174, any alternative that did not allow the Department to make immediate promotions and that did not compensate the plaintiffs for the delay in implementing the promotion procedure was inadequate.

ment needs to make promotions. Thus, if external forces, such as budget cuts, necessitate a promotion freeze, the Department will not be required to make gratuitous promotions to remain in compliance with the court's order.[29]

Most significantly, the one-for-one requirement is ephemeral; the term of its application is contingent upon the Department's own conduct. The requirement endures only until the Department comes up with a procedure that does not have a discriminatory impact on blacks—something the Department was enjoined to do in 1972 and expressly promised to do by 1980. As noted at n. 21, *supra*, the court has taken into account the difficulty of validating a test and does not require validation as a prerequisite for suspension of the promotional requirement. The one-for-one requirement evaporated at the ranks of corporal and sergeant upon implementation of promotion procedures without an adverse impact, demonstrating that it is not a disguised means to achieve racial balance. Cf. *Sheet Metal Workers, supra,* at 487 (POWELL, J., concurring in part and concurring in judgment).

Finally, the record reveals that this requirement was flexible, waivable, and temporary in application. When the District Court imposed the provision, the judge expressed the hope that its use would be "a one-time occurrence." 585 F. Supp., at 76. The court believed that this hope would be fulfilled: at the January 15, 1984, hearing on the plaintiffs' mo-

---

[29] Cf. *Sheet Metal Workers,* 478 U. S., at 478 (opinion of BRENNAN, J.) ("The [district] court has twice adjusted the deadline for achieving the [membership] goal, and has continually approved of changes in the size of the apprenticeship classes to account for the fact that economic conditions prevented petitioners from meeting their membership targets; there is every reason to believe that both the court and the administrator will continue to accommodate *legitimate* explanations for petitioners' failure to comply with the court's orders"); *id.*, at 487–488 (POWELL, J., concurring in part and concurring in judgment) ("Additional flexibility is evidenced by the fact that this goal, originally set to be achieved by 1981, has been twice delayed and is now set for 1987").

tion to enforce the consent decrees, "the Personnel Department pledged that it would *now* devote its full resources to assisting the Public Safety Department in not only developing acceptable promotion procedures as required by the two consent decrees, but in doing so within the near future." App. 141. The Department has since timely submitted procedures for promotions to corporal and sergeant, and the court has consequently suspended application of the promotional order with respect to those ranks. In the higher ranks, the Department has been permitted to promote only white troopers. It now appears that the effect of the order enforcing the decrees will be "the development of acceptable promotion procedures for all ranks and the nullification of the promotion quota." 767 F. 2d, at 1538, n. 19. The remedy chosen has proved both effective and flexible.

## C

We must also examine the relationship between the numerical relief ordered and the percentage of nonwhites in the relevant work force. The original hiring order of the District Court required the Department to hire 50% black applicants until 25% of the state trooper force was composed of blacks; the latter figure reflects the percentage of blacks in the relevant labor market. 585 F. Supp., at 75, n. 2. The enforcement order at issue here is less restrictive: it requires the Department to promote 50% black candidates until 25% of the rank in question is black, but *only* until a promotion procedure without an adverse impact on blacks is in place. Thus, had the promotion order remained in effect for the rank of corporal, it would have survived only until 25% of the Department's corporals were black.

The Government suggests that the one-for-one requirement is arbitrary because it bears no relationship to the 25% minority labor pool relevant here. This argument ignores that the 50% figure is not itself the goal; rather it represents the speed at which the goal of 25% will be achieved. The

interim requirement of one-for-one promotion (had it continued) would simply have determined how quickly the Department progressed toward this ultimate goal. This requirement is therefore analogous to the imposition in *Sheet Metal Workers* of an end date, which regulated the speed of progress toward fulfillment of the hiring goal. *Sheet Metal Workers*, 478 U. S., at 487–488 (POWELL, J., concurring in part and concurring in judgment).

To achieve the goal of 25% black representation in the upper ranks, the court was not limited to ordering the promotion of only 25% blacks at any one time. Some promptness in the administration of relief was plainly justified in this case, and use of deadlines or end dates had proved ineffective. In these circumstances, the use of a temporary requirement of 50% minority promotions, which, like the end date in *Sheet Metal Workers*, was crafted and applied flexibly, was constitutionally permissible.

The District Court did not accept the argument that in order to achieve a goal of 25% representation, it could order only 25% of any particular round of promotions to be awarded to minorities. Had it done so, the court would have implemented the Department's proposal to promote 4 blacks and 11 whites when it issued its order enforcing the consent decree, because this proposal approximated the 25% figure.[30] Again, however, this proposal completely ignores the fact and the effects of the Department's past discrimination and its delay in implementing the necessary promotion proce-

---

[30] Following adoption of the plaintiffs' proposal that 8 blacks and 8 whites should be promoted, the corporal rank was composed of 14 black and 73 white troopers (16% black). Under the Department's proposal that 4 blacks and 11 whites should be promoted, the corporal rank would have been composed of 8 black and 79 white troopers (9.2% black). Neither proposal would have raised the percentage of blacks in the corporal rank to the 25% mark set as an alternative goal by the District Court (the other alternative being the adoption of a promotion procedure without adverse impact). Obviously, however, the plaintiffs' proposal provided an accelerated approach to achieving that goal to compensate for past delay.

dure. Here the District Court considered both the Department's proposal and the possibility of promoting blacks to all 15 corporal positions "[i]n light of the department's failure after almost twelve years to eradicate the continuing effects of its own discrimination and to develop acceptable promotion procedures and in light of the severity of the existing racial imbalances." 585 F. Supp., at 75, n. 1. The court rejected both of these alternatives and, upon consideration of the Department's behavior and of the interests and the purposes to be served, arrived at an intermediate figure. Although the appropriate ratio here "necessarily involve[d] a degree of approximation and imprecision," *Teamsters* v. *United States*, 431 U. S. 324, 372 (1977), the District Court, with its first-hand experience of the parties and the potential for resistance, imposed the requirement that it determined would compensate for past delay and prevent future recalcitrance, while not unduly burdening the interests of white troopers.[31]

It would have been improper for the District Judge to ignore the effects of the Department's delay and its continued default of its obligation to develop a promotion procedure, and to require only that, commencing in 1984, the Department promote one black for every three whites promoted. The figure selected to compensate for past discrimination and delay necessarily involved a delicate calibration of the rights

---

[31] We have previously recognized the importance of expediting elimination of the vestiges of longstanding discrimination. In *United States* v. *Montgomery County Bd. of Education*, 395 U. S. 225 (1969), we upheld a District Court's imposition of a black-to-white faculty goal against modifications made by the Court of Appeals, saying that the District Court order "was adopted in the spirit of this Court's opinion in *Green* v. *County School Board*, [391 U. S. 430, 439 (1968)], in that his plan 'promises realistically to work, and promises realistically to work *now*.' The modifications ordered by the panel of the Court of Appeals, while of course not intended to do so, would, we think, take from the order some of its capacity to expedite, by means of specific commands, the day when a completely unified, unitary, nondiscriminatory school system becomes a reality instead of a hope. . . ." *Id.*, at 235.

and interests of the plaintiff class, the Department, and the white troopers. The Government concedes that a one-to-three requirement would have been lawful, Tr. of Oral Arg. 43; the District Court determined that more stringent measures were necessary. This Court should not second-guess the lower court's carefully considered choice of the figure necessary to achieve its many purposes, especially when that figure is hedged about with specific qualifying measures designed to prevent any unfair impact that might arise from rigid application.[32]

## D

The one-for-one requirement did not impose an unacceptable burden on innocent third parties. As stated above, the temporary and extremely limited nature of the requirement substantially limits any potential burden on white applicants for promotion. It was used only once at the rank of corporal and may not be utilized at all in the upper ranks. Nor has the court imposed an "absolute bar" to white advancement. *Sheet Metal Workers, supra,* at 481. In the one instance in which the quota was employed, 50% of those elevated were white.

The one-for-one requirement does not require the layoff and discharge of white employees and therefore does not impose burdens of the sort that concerned the plurality in *Wygant,* 476 U. S., at 283 (opinion of POWELL, J.) ("[L]ay-offs impose the entire burden of achieving racial equality on particular individuals, often resulting in serious disruption of

---

[32] JUSTICE O'CONNOR's dissent suggests that the percentage of minority individuals benefited by this race-conscious remedial order should not exceed the percentage of minority groups members in the relevant population or work force. *Post,* at 198. We disagree. Even within the narrow confines of strict scrutiny, there remains the requirement that the District Court not only *refrain* from ordering relief that violates the Constitution, but also that it *order* the relief necessary to cure past violations and to obtain compliance with its mandate. There will be cases—this is one— where some accelerated relief is plainly justified. To say that it is not overlooks the history of this litigation.

their lives"); *id.*, at 295 (WHITE, J., concurring) (same). Because the one-for-one requirement is so limited in scope and duration, it only postpones the promotions of qualified whites. Consequently, like a hiring goal, it "impose[s] a diffuse burden, . . . foreclosing only one of several opportunities." *Id.*, at 283. "Denial of a future employment opportunity is not as intrusive as loss of an existing job," *id.*, at 282–283 (opinion of POWELL, J.), and plainly postponement imposes a lesser burden still.[33]

Finally, the basic limitation, that black troopers promoted must be qualified, remains. Qualified white candidates simply have to compete with qualified black candidates. To be sure, should the District Court's promotion requirement be applied, black applicants would receive some advantage. But this situation is only temporary, and is subject to amelioration by the action of the Department itself.

Accordingly, the one-for-one promotion requirement imposed in this case does not disproportionately harm the interests, or unnecessarily trammel the rights, of innocent individuals.

### E

In determining whether this order was "narrowly tailored," we must acknowledge the respect owed a district judge's judgment that specified relief is essential to cure a violation of the Fourteenth Amendment. A district court has "not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Louisiana* v. *United States*, 380 U. S. 145, 154 (1965). "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is

---

[33] In the promotion procedure proposed by the Department in 1981, seniority counted as 10% of the candidate's score. App. 56. But, under the point system established, *differences* in seniority among candidates could affect scores by no more than 3%. *Id.*, at 50–51. Greater seniority did not, therefore, by itself create an expectation of promotion.

broad, for breadth and flexibility are inherent in equitable remedies." *Swann* v. *Charlotte-Mecklenburg Bd. of Education,* 402 U. S. 1, 15 (1971).

Nor have we in all situations "required remedial plans to be limited to the least restrictive means of implementation. We have recognized that the choice of remedies to redress racial discrimination is 'a balancing process left, within appropriate constitutional or statutory limits, to the sound discretion of the trial court.'" *Fullilove* v. *Klutznick,* 448 U. S. 448, 508 (1980) (POWELL, J., concurring) (quoting *Franks* v. *Bowman Transportation Co.,* 424 U. S., at 794 (POWELL, J., concurring in part and dissenting in part)). Cf. *Green* v. *New Kent County School Board,* 391 U. S., at 439 ("The obligation of the district courts, as it always has been, is to assess the effectiveness of a proposed plan in achieving desegregation. There is no universal answer to the complex problems of desegregation; there is obviously no one plan that will do the job in every case. The matter must be assessed in light of the circumstances present and the options available in each instance").

The district court has firsthand experience with the parties and is best qualified to deal with the "flinty, intractable realities of day-to-day implementation of constitutional commands." *Swann, supra,* at 6. In this case, as in *Sheet Metal Workers,* "[the] court having had the parties before it over a period of time, was in the best position to judge whether an alternative remedy, such as a simple injunction, would have been effective in ending [the] discriminatory practices." 478 U. S., at 486 (POWELL, J., concurring). The District Judge determined that the record demonstrated that "without promotional quotas the continuing effects of [the Department's] discrimination cannot be eliminated." 585 F. Supp., at 76. His proximate position and broad equitable powers mandate substantial respect for this judgment.

Plainly the District Court's discretion in remedying the deeply rooted Fourteenth Amendment violations here was limited by the rights and interests of the white troopers seeking promotion to corporal. But we conclude that the District Judge properly balanced the individual and collective interests at stake, including the interests of the white troopers eligible for promotion, in shaping this remedy. See *Swann, supra,* at 16 ("The task is to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution"). While a remedy must be narrowly tailored, that requirement does not operate to remove all discretion from the District Court in its construction of a remedial decree.[34]

## IV

The remedy imposed here is an effective, temporary, and flexible measure. It applies only if qualified blacks are available, only if the Department has an objective need to make promotions, and only if the Department fails to implement a promotion procedure that does not have an adverse impact on blacks. The one-for-one requirement is the product of the considered judgment of the District Court which, with its knowledge of the parties and their resources, properly determined that strong measures were required in light of the Department's long and shameful record of delay and resistance.

The race-conscious relief imposed here was amply justified and narrowly tailored to serve the legitimate and laudable

---

[34] See also *Fullilove,* 448 U. S., at 527 (Stewart, J., dissenting) (contrasting legislative branch with court of equity and suggesting that the latter has the "dispassionate objectivity" and the "flexibility" necessary "to mold a race-conscious remedy around the single objective of eliminating the effects of past or present discrimination"); *International Salt Co.* v. *United States,* 332 U. S. 392, 400 (1947) (Jackson, J.) ("The framing of decrees should take place in the District rather than in Appellate Courts. They are invested with large discretion to model their judgments to the exigencies of the particular case") (citations and footnote omitted).

purposes of the District Court. The judgment of the Court of Appeals, upholding the order of the District Court, is

*Affirmed.*

JUSTICE POWELL, concurring.

In many respects this case is similar to *Sheet Metal Workers* v. *EEOC*, 478 U. S. 421 (1986). Here, as in that case, racial discrimination had been continued for many years in contravention of repeated decisions of the District Court. *NAACP* v. *Allen*, 340 F. Supp. 703, 705 (MD Ala. 1972); *Paradise* v. *Dothard*, Civ. Action No. 3561–N (MD Ala., Aug 5, 1975); *Paradise* v. *Shoemaker*, 470 F. Supp. 439, 442 (MD Ala. 1979); *Paradise* v. *Prescott*, 585 F. Supp. 72, 74 (MD Ala. 1983). There are differences. *Sheet Metal Workers* involved an action under Title VII, and here the courts below found a violation of the Equal Protection Clause.[1] Also, in *Sheet Metal Workers* the District Court had finally cited the union for contempt. This difference is of no importance where, as here, it has been established beyond question that the Department of Public Safety had engaged in persistent violation of constitutional rights and repeatedly failed to carry out court orders. In such circumstances there is a "compelling governmental interest sufficient to justify the imposition of a racially classified remedy." *Sheet Metal Workers* v. *EEOC, supra,* at 485.

I therefore agree with the plurality that the protracted history of this litigation justifies the conclusion that the "one-for-one" promotion to corporal was appropriate. It is reasonable to conclude that the District Court would have been "powerless to provide an effective remedy" if it had lacked authority to establish a benchmark against which to measure progress in remedying the effects of the discrimination. *Sheet Metal Workers* v. *EEOC*, 478 U. S., at 487.

[1] Although we need not resolve the question in this case, I have not thought the standards of analysis in Title VII and equal protection cases—though similar—are identical.

In determining whether an affirmative-action remedy is narrowly drawn to achieve its goal, I have thought that five factors may be relevant: (i) the efficacy of alternative remedies; (ii) the planned duration of the remedy; (iii) the relationship between the percentage of minority workers to be employed and the percentage of minority group members in the relevant population or work force; (iv) the availability of waiver provisions if the hiring plan could not be met; and (v) the effect of the remedy upon innocent third parties. *Id.*, at 485–486; *Fullilove* v. *Klutznick*, 448 U. S. 448, 510–511, 514 (1980) (opinion of POWELL, J.).[2] The plurality opinion today makes clear that the affirmative action ordered by the Dis-

---

[2] Our decisions make clear that all government-imposed, affirmative-action plans must be closely scrutinized because "[r]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Fullilove* v. *Klutznick*, 448 U. S., at 537 (STEVENS, J., dissenting). Because racial distinctions are inherently suspect whether they are imposed by a legislature or a court, we have never measured court-ordered, affirmative-action remedies against a less demanding standard.

JUSTICE STEVENS' opinion concurring in the judgment relies primarily on school desegregation decisions such as *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1 (1971). See *post*, at 194–195. Although these cases are broadly relevant, they differ significantly from the Court's subsequent affirmative-action decisions. To be sure, a pupil who is bused from a neighborhood school to a comparable school in a different neighborhood may be inconvenienced. Indeed, I have said that "[e]xtensive pupil transportation may threaten liberty or privacy interests." *Washington* v. *Seattle School District No. 1*, 458 U. S. 457, 492, n. 6 (1982). But the position of bused pupils is far different from that of employees who are laid off or denied promotion. Court-ordered busing does not deprive students of any race of an equal opportunity for an education. Cf. *Regents of the University of California* v. *Bakke*, 438 U. S. 265, 300 n. 39 (1978) (opinion of POWELL, J.) (distinguishing bused pupil from applicant denied admission to medical school). Moreover, as the Court noted in *Swann*, busing had been common for years in many schools districts throughout the country. 402 U. S., at 29–30. See also *Keyes* v. *School Dist. No. 1, Denver, Colo.*, 413 U. S. 189, 243, n. 22 (1973) (POWELL, J., concurring in part and dissenting in part).

trict Court and approved by the Court of Appeals for the Eleventh Circuit was narrowly drawn to achieve the goal of remedying the proven and continuing discrimination. In view of the plurality's thorough opinion, I will mention only certain aspects of the plan before us.

The District Court imposed the one-for-one promotion requirement only on one occasion, when it ordered the promotion of eight blacks and eight whites to the rank of corporal in February 1984. Because the Department urgently needed at least 15 additional corporals, see *Paradise* v. *Prescott*, 580 F. Supp. 171, 173 (MD Ala. 1983), there appears to have been no alternative remedy that would have met the then-existing need. Given the findings of persistent discrimination, the Department's longstanding resistance to necessary remedies, and the exigent circumstances presented to the District Court, the imposition of a one-for-one requirement for the particular promotions at issue did not violate the Equal Protection Clause.

The District Court's order contains significant elements of flexibility and fairness. First, it applies only if qualified black candidates are available for promotion. Second, the court suspended the order when the Department proposed procedures that appeared likely to have no adverse impact on minority applicants. It thus appears that the court's order is based upon "realistic expectations," and that the one-for-one requirement is likely to be, as the court intended, a "one-time occurrence." *Paradise* v. *Prescott, supra*, at 75–76. The court's actions indicate that the order will be enforced in a constitutional manner if it is reimposed. As in *Sheet Metal Workers*, "[a]n examination of what *has occurred* in this litigation over the years makes plain that the District Court has not enforced the goal in [a] rigid manner." 478 U. S., at 489, n. 4 (emphasis in original).

Finally, and particularly important, the effect of the order on innocent white troopers is likely to be relatively diffuse. Unlike layoff requirements, the promotion requirement at

issue in this case does not "impose the entire burden of achieving racial equality on particular individuals," and does not disrupt seriously the lives of innocent individuals. See *Wygant* v. *Jackson Board of Education,* 476 U. S. 267, 283 (1986) (opinion of POWELL, J.).[3] Although the burden of a narrowly prescribed promotion goal, as in this case, is not diffused throughout society generally, the burden is shared by the nonminority employees over a period of time. As noted above, only qualified minority applicants are eligible for promotion, and qualified nonminority applicants remain eligible to compete for the available promotions. Although some white troopers will have their promotions delayed, it is uncertain whether any individual trooper, white or black, would have achieved a different rank, or would have achieved it at a different time, but for the promotion requirement.

In view of the purpose and indeed the explicit language of the Equal Protection Clause, court-ordered or government-adopted, affirmative-action plans must be most carefully scrutinized. The plurality in its opinion today has done this. I therefore join the opinion.

JUSTICE STEVENS, concurring in the judgment.

In 1971, one year before the District Court found in this case that the State of Alabama had persistently maintained a deliberately segregated police force, this Court issued a unanimous opinion setting forth the guidelines for district judges in fashioning remedies to eliminate the effects of racial segregation in public schools. *Swann* v. *Charlotte-Mecklenburg Bd. of Education,* 402 U. S. 1 (1971). The central theme of that opinion is that race-conscious remedies are obviously required to remedy racially discriminatory actions by the State that violate the Fourteenth Amendment.

---

[3] See generally Fallon & Weiler, Firefighters v. Stotts: Conflicting Models of Racial Justice, 1984 S. Ct. Rev. 1, 28–32 (contending that allocating the costs of affirmative-action remedies raises separate issues of fairness).

Because *Swann* explained the appropriate governing standard, it must have provided guidance to the District Court in this case and it should now guide our deliberations. Chief Justice Burger wrote:

"Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.

"'The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.' *Hecht Co.* v. *Bowles*, 321 U. S. 321, 329–330 (1944), cited in *Brown* [v. *Board of Education*, 349 U. S.], at 300." 402 U. S., at 15.

In this case, the record discloses an egregious violation of the Equal Protection Clause. It follows, therefore, that the District Court had broad and flexible authority to remedy the wrongs resulting from this violation—exactly the opposite of the Solicitor General's unprecedented suggestion that the judge's discretion is constricted by a "narrowly tailored to achieve a compelling governmental interest" standard. Brief for United States 17.[1]

---

[1] JUSTICE O'CONNOR's dissenting opinion also advances the novel theory that in reviewing the validity of a federal district court's remedial order, the Court must first decide whether the order is "'supported by a compelling [governmental] purpose.'" *Post,* at 196 (quoting *Wygant* v. *Jackson Board of Education,* 476 U. S. 267, 274 (1986)). The substitution of the word "governmental" for the word "state" in the quotation from *Wygant* emphasizes the novelty of the suggestion that a test that may be appropriate for determining the constitutionality of state executive or legislative action should also be used in reviewing federal judicial decrees. In *Wygant* the Court was confronted with the question whether certain *state*

The notion that this Court should craft special and narrow rules for reviewing judicial decrees in racial discrimination cases was soundly rejected in *Swann*. Chief Justice Burger wrote for a unanimous Court:

> "[A] school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right. The task is to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution.
>
> .       .       .       .       .
>
> "In default by the school authorities of their obligation to proffer acceptable remedies, a district court has broad power to fashion a remedy that will assure a unitary school system." 402 U. S., at 15–16.

The Court was equally unambiguous in its rejection of the argument that a different standard of review is required when a remedial decree employs mathematical ratios.

> "We see therefore that the use made of mathematical ratios was no more than a starting point in the process of shaping a remedy, rather than an inflexible requirement. From that starting point the District Court proceeded to frame a decree that was within its discretionary powers, as an equitable remedy for the particular circumstances. As we said in *Green* [v. *County School Bd.*, 391 U. S.

---

action violated the Equal Protection Clause of the Fourteenth Amendment. Here the State's violation of that Clause is established—the State's purpose in maintaining an all-white police force was obviously illegitimate. In contrast, the *federal* purpose that is served by the District Court's decree is to eliminate the consequences of the State's pervasive, systematic, and obstinate discriminatory conduct. There is nothing in the District Court's decree that is even arguably inconsistent with this *federal* purpose. Because the decree is neither "overinclusive" nor "underinconclusive," the metaphor of narrow tailoring that is often used in considering the merits of claims based on the Equal Protection Clause simply does not fit the issue before the Court.

430 (1968),] a school authority's remedial plan or a district court's remedial decree is to be judged by its effectiveness. Awareness of the racial composition of the whole school system is likely to be a useful starting point in shaping a remedy to correct past constitutional violations. In sum, the very limited use made of mathematical ratios was within the equitable remedial discretion of the District Court." *Id.*, at 25.

"Absent a constitutional violation there would be no basis for judicially ordering assignment of students on a racial basis. All things being equal, with no history of discrimination, it might well be desirable to assign pupils to schools nearest their homes. But all things are not equal in a system that has been deliberately constructed and maintained to enforce racial segregation. The remedy for such segregation may be administratively awkward, inconvenient, and even bizarre in some situations and may impose burdens on some; but all awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made to eliminate the dual school systems." *Id.*, at 28.

"The Court of Appeals, searching for a term to define the equitable remedial power of the district courts, used the term 'reasonableness.' In *Green, supra,* this Court used the term 'feasible' and by implication, 'workable,' 'effective,' and 'realistic' in the mandate to develop 'a plan that promises realistically to work, and . . . to work *now.*' On the facts of this case, we are unable to conclude that the order of the District Court is not reasonable, feasible and workable. However, in seeking to define the scope of remedial power or the limits on remedial power of courts in an area as sensitive as we deal with here, words are poor instruments to convey the sense of basic fairness inherent in equity. Substance, not semantics, must govern, and we have sought to sug-

gest the nature of limitations without frustrating the appropriate scope of equity." *Id.*, at 31.

A party who has been found guilty of repeated and persistent violations of the law bears the burden of demonstrating that the chancellor's efforts to fashion effective relief exceed the bounds of "reasonableness."[2] The burden of proof in a case like this is precisely the opposite of that in cases such as *Wygant* v. *Jackson Board of Education*, 476 U. S. 267 (1986), and *Fullilove* v. *Klutznick*, 448 U. S. 448 (1980), which did not involve any proven violations of law.[3] In such cases the governmental decisionmaker who would make race-conscious decisions must overcome a strong presumption against them. No such burden rests on a federal district judge who has found that the governmental unit before him is

---

[2] Inevitably, promotions of the white officers who have been beneficiaries of the past illegal conduct may be delayed even though they are "innocent victims" in the sense that they are not individually responsible for the past illegal conduct. But it is most incongruous to imply, as JUSTICE O'CONNOR's dissent does, that this impact on white "victims" requires that the Federal District Court's decree be judged by the same standards as the State's policy of discriminating against black employees in promotion and against black applicants in hiring. Given the violation of law disclosed by the record, the District Court's use of a racial classification to remedy that violation was presumptively valid; in contrast, the State's racial classification was presumptively invalid.

[3] The law violator who would oppose a remedy imposed against him as itself a violation of the law does not stand in the same position as an innocent party; those whom the court has found in the wrong may not oppose a remedy on the ground that it would constitute a wrong if leveled at a nonparticipant in the litigation. "In fashioning a remedy, the District Court may, of course, consider the fact that its injunction may impinge upon rights that would otherwise be constitutionally protected, but those protections do not prevent it from remedying" the violations. *National Society of Professional Engineers* v. *United States*, 435 U. S. 679, 697–698 (1978). See also *International Salt Co.* v. *United States*, 332 U. S. 392, 400–401 (1947); *Teachers* v. *Hudson*, 475 U. S. 292, 309–310, n. 22 (1986) ("The judicial remedy for a proven violation of law will often include commands that the law does not impose on the community at large") (citations omitted).

guilty of racially discriminatory conduct that violates the Constitution.

The relief that the district judge has a duty to fashion must unavoidably consider race. A unanimous Court held in *North Carolina State Board of Education* v. *Swann,* 402 U. S. 43 (1971), a case decided on the same day as *Swann* v. *Charlotte-Mecklenburg Board of Education,* that the State's Anti-Busing Law, which prohibited assignment of any student on account of race or for the purpose of creating a racial balance in the schools, conflicted with the State's duty to remedy constitutional violations. We observed:

> "[T]he statute exploits an apparently neutral form to control school assignment plans by directing that they be 'color blind'; that requirement, against the background of segregation, would render illusory the promise of *Brown* v. *Board of Education,* 347 U. S. 483 (1954). Just as the race of students must be considered in determining whether a constitutional violation has occurred, so also must race be considered in formulating a remedy. To forbid, at this stage, all assignments made on the basis of race would deprive school authorities of the one tool absolutely essential to fulfillment of their constitutional obligation to eliminate existing dual school systems.
>
> "Similarly, the flat prohibition against assignment of students for the purpose of creating a racial balance must inevitably conflict with the duty of school authorities to disestablish dual school systems. As we have held in *Swann,* the Constitution does not compel any particular degree of racial balance or mixing, but when past and continuing constitutional violations are found, some ratios are likely to be useful starting points in shaping a remedy." 402 U. S., at 45–46.

The District Court, like the school authority in *North Carolina State Board of Education* v. *Swann,* may, and in some instances must, resort to race-conscious remedies to

vindicate federal constitutional guarantees. Because the instant employment discrimination case "does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right," *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S., at 15–16, and because there has been no showing that the District Judge abused his discretion in shaping a remedy, I concur in the Court's judgment.[4]

---

[4] For reasons that are not entirely clear to me, JUSTICE POWELL assumes that the standard to be applied in reviewing the court-ordered action a State must take to correct its violations of the Equal Protection Clause is different when the violations take place in the administration of a public school system than when they occur in the operation of a public law enforcement agency. *Ante*, at 187, n. 2. Dismissing the inconvenience of being bused as a relatively inconsequential by-product of the remedial decree, JUSTICE POWELL suggests that desegregation decisions upholding the District Court's broad remedial powers are less than fully applicable to this case; he seems to regard the possibility that some white troopers will have their promotions delayed, see *ante*, at 188–189, as mandating a different and more exacting standard of review.

I cannot agree that the applicability of the school desegregation cases in determining the validity of any particular remedial solution fashioned by a district court and imposed on a State depends on detailed and inevitably imprecise calculations of hardship. For me the relevant fact in this case is that the remedial order was directed against a proven violator of the Constitution. Just as I believe that a uniform standard should govern our review of the merits of an equal protection claim, see *Craig* v. *Boren*, 429 U. S. 190, 211 (1976) (STEVENS, J., concurring), so do I believe that a uniform standard should govern our review of all such decrees entered by district courts. Of course, different violations require different remedies, but they should be reviewed under the principles of equitable discretion set forth in the school desegregation cases. "[A] school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right." *Swann* v. *Charlotte-Mecklenburg Bd. of Education*, 402 U. S. 1, 15–16 (1971). The district court's task in each case is to "be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. These cases call for the exercise of the traditional attributes of equity power." *Brown* v. *Board of Education*,

JUSTICE WHITE, dissenting.

Agreeing with much of what JUSTICE O'CONNOR has written in this case, I find it evident that the District Court exceeded its equitable powers in devising a remedy in this case. I therefore dissent from the judgment of affirmance.

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join, dissenting.

In *Wygant* v. *Jackson Board of Education*, 476 U. S. 267, 273 (1986), we concluded that the level of Fourteenth Amendment "scrutiny does not change merely because the challenged classification operates against a group that historically has not been subject to governmental discrimination." Thus, in evaluating the constitutionality of the District Court order in this case under the Fourteenth Amendment, we must undertake a two-part inquiry. First, we must decide whether the order is "supported by a compelling [governmental] purpose." *Ibid.* Second, we must scrutinize the order to ensure that "the means chosen to accomplish that purpose are narrowly tailored." *Ibid.*

One cannot read the record in this case without concluding that the Alabama Department of Public Safety had undertaken a course of action that amounted to "pervasive, systematic, and obstinate discriminatory conduct." *Ante,* at 167. Because the Federal Government has a compelling interest in remedying past and present discrimination by the Department, the District Court unquestionably had the authority to fashion a remedy designed to end the Department's egregious history of discrimination. In doing so, however, the District Court was obligated to fashion a remedy that was narrowly tailored to accomplish this purpose. The plurality

---

349 U. S. 294, 300 (1955) (footnotes omitted). Thus, the remedial issue in these cases is dramatically different from the question whether a statutory racial classification can be justified as a response to a past societal wrong. See *Fullilove* v. *Klutznick*, 448 U. S. 448, 537–539 (1980) (STEVENS, J., dissenting).

today purports to apply strict scrutiny, and concludes that the order in this case was narrowly tailored for its remedial purpose. Because the Court adopts a standardless view of "narrowly tailored" far less stringent than that required by strict scrutiny, I dissent.

As JUSTICE POWELL notes, this case is similar to *Sheet Metal Workers* v. *EEOC*, 478 U. S. 421 (1986). In *Sheet Metal Workers*, I observed that "it is completely unrealistic to assume that individuals of each race will gravitate with mathematical exactitude to each employer or union absent unlawful discrimination." *Id.*, at 494. Thus, a rigid quota is impermissible because it adopts "an unjustified conclusion about the precise extent to which past discrimination has lingering effects, or . . . an unjustified prediction about what would happen in the future in the absence of continuing discrimination." *Id.*, at 494–495. Even more flexible "goals," however, also may trammel unnecessarily the rights of nonminorities. Racially preferential treatment of nonvictims, therefore, should only be ordered "where such remedies are truly necessary." *Id.*, at 496. Thus, "the creation of racial preferences by courts, even in the more limited form of goals rather than quotas, must be done sparingly and only where manifestly necessary." *Id.*, at 496–497.

In my view, whether characterized as a goal or a quota, the District Court's order was not "manifestly necessary" to achieve compliance with that court's previous orders. The order at issue in this case clearly had one purpose, and one purpose only—to compel the Department to develop a promotion procedure that would not have an adverse impact on blacks. Although the plurality and the courts below suggest that the order also had the purpose of "eradicat[ing] the ill effects of the Department's delay in producing" such a promotion procedure, *ante*, at 171, the District Court's subsequent implementation of the order makes clear that the order cannot be defended on the basis of such a purpose.

The order imposed the promotion quota only until the Department developed a promotion procedure that complied with the consent decrees. If the order were truly designed to eradicate the effects of the Department's delay, the District Court would certainly have continued the use of the one-for-one quota even after the Department had complied with the consent decrees. Consistent with the terms of the order, once the Department developed a promotion procedure that did not have an adverse impact on blacks, the District Court suspended application of the quota. Under the approved promotion procedure, 13 troopers were promoted to corporal, of whom 3 (23.1%) were black. App. 160. The result of this new procedure was the promotion of a *lower* percentage of blacks than the purported goal of 25% black representation in the upper ranks, and the promotion of *fewer* blacks than even the Department's promotion proposal rejected by the District Court. To say the least, it strains credibility to view the one-for-one promotion quota as designed to eradicate the past effects of the Department's delay when the quota was suspended once the Department developed a promotion procedure that promoted a *lower* percentage of blacks than the 25% black representation goal.

Moreover, even if the one-for-one quota had the purpose of eradicating the effects of the Department's delay, this purpose would not justify the quota imposed in this case. "[T]he relationship between the percentage of minority workers to be [promoted] and the percentage of minority group members in the relevant population or work force" is of vital importance in considering the validity of a racial goal. *Sheet Metal Workers* v. *EEOC, supra,* at 486 (POWELL, J., concurring in part and concurring in judgment). The one-for-one promotion quota used in this case far exceeded the percentage of blacks in the trooper force, and there is no evidence in the record that such an extreme quota was necessary to eradicate the effects of the Department's delay. The plurality attempts to defend this one-for-one promotion quota as

merely affecting the speed by which the Department attains the goal of 25% black representation in the upper ranks. *Ante*, at 179–180. Such a justification, however, necessarily eviscerates any notion of "narrowly tailored" because it has no stopping point; even a 100% quota could be defended on the ground that it merely "determined how quickly the Department progressed toward" some ultimate goal. *Ante*, at 180. If strict scrutiny is to have any meaning, therefore, a promotion goal must have a closer relationship to the percentage of blacks eligible for promotions. This is not to say that the percentage of minority individuals benefited by a racial goal may never exceed the percentage of minority group members in the relevant work force. But protection of the rights of nonminority workers demands that a racial goal not substantially exceed the percentage of minority group members in the relevant population or work force absent compelling justification. In this case the District Court—and indeed this Court—provide no such compelling justification for the choice of a one-for-one promotion quota rather than a lower quota. In my view, therefore, the order in this case must stand or fall on its stated purpose of coercing the Department to develop a promotion procedure without an adverse impact on black troopers.

Given the singular *in terrorem* purpose of the District Court order, it cannot survive strict scrutiny. There is simply no justification for the use of racial preferences if the purpose of the order could be achieved without their use because "[r]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Fullilove* v. *Klutznick*, 448 U. S. 448, 537 (1980) (STEVENS, J., dissenting). Thus, to survive strict scrutiny, the District Court order must fit with greater precision than any alternative remedy. See Ely, The Constitutionality of Reverse Racial Discrimination, 41 U. Chi. L. Rev. 723, 727, n. 26 (1974). The District Court had available several alternatives that would have achieved full compliance

with the consent decrees without trammeling on the rights of nonminority troopers. The court, for example, could have appointed a trustee to develop a promotion procedure that would satisfy the terms of the consent decrees. By imposing the trustee's promotion procedure on the Department until the Department developed an alternative promotion procedure that complied with the consent decrees, the District Court could have enforced the decrees without the use of racial preferences. Alternatively, the District Court could have found the recalcitrant Department in contempt of court, and imposed stiff fines or other penalties for the contempt. Surely, some combination of penalties could have been designed that would have compelled compliance with the consent decrees.

The District Court, however, did not discuss these options or *any* other alternatives to the use of a racial quota. Not a single alternative method of achieving compliance with the consent decrees is even mentioned in the District Court's opinion—with the exception of an even more objectionable *100% racial quota*. See *Paradise* v. *Prescott*, 585 F. Supp. 72, 75, n. 1 (MD Ala 1983). What is most disturbing about the District Court's order, therefore, is not merely that it implicitly or explicitly rejected two particular options, but that the District Court imposed the promotion quota *without consideration of any of the available alternatives*. Even in *Sheet Metal Workers* v. *EEOC*, 478 U. S. 421 (1986), the District Court had "considered the efficacy of alternative remedies" before imposing a racial quota. *Id.*, at 481; see also *id.*, at 486–487 (POWELL, J., concurring in part and concurring in judgment). Thus, the Court was able to evaluate the claim that the racial quota was "necessary." Without any exploration of the available alternatives in the instant case, no such evaluation is possible. Remarkably, however, the plurality—purporting to apply "strict scrutiny"—concludes that the order in this case was narrowly tailored for a remedial purpose.

Although the plurality states that it is merely "respect-[ing]" the "balancing process" of the District Court, *ante*, at 184, it wholly ignores the fact that no such "balancing process" took place in this case. For even if, as the plurality insists, the District Court "'was in the best position to judge whether an alternative remedy, such as a simple injunction, would have been effective in ending [the] discriminatory practices,'" *ibid.* (quoting *Sheet Metal Workers, supra*, at 486 (POWELL, J., concurring in part and concurring in judgment)), the *least* that strict scrutiny requires is that the District Court expressly evaluate the available alternative remedies. If a District Court order that is imposed after no evident consideration of the available alternatives can survive strict scrutiny as narrowly tailored, the requirement that a racial classification be "narrowly tailored" for a compelling governmental purpose has lost most of its meaning.

I have no quarrel with the plurality's conclusion that the recalcitrance of the Department of Public Safety in complying with the consent decrees was reprehensible. In its understandable frustration over the Department's conduct, however, the District Court imposed a racial quota without first considering the effectiveness of alternatives that would have a lesser effect on the rights of nonminority troopers. Because the District Court did not even consider the available alternatives to a one-for-one promotion quota, and because these alternatives would have successfully compelled the Department to comply with the consent decrees, I must respectfully dissent.