**SOCIETY FOR GOOD WILL FOR RETARDED CHILDREN, INC., et al., Plaintiffs,**

v.

**Mario M. CUOMO, as Governor of the State of New York, et al., Defendants.**

**No. 78–CV–1847.**

United States District Court,
E.D. New York.

Aug. 3, 1989.

Michael S. Lottman, Murray B. Schnepps, East Hartford, Conn., for plaintiffs.

Robert Abrams, Atty. Gen. of State of N.Y. by Caren S. Brutten, Stephen Mendelsohn, New York City, for defendants.

### MEMORANDUM AND ORDER

### FINAL JUDGMENT

WEINSTEIN, District Judge.

■ This litigation seeking relief for alleged unconstitutional conditions and violations of state and federal statutes at the Long Island Developmental Center for profoundly mentally and otherwise disabled persons has been before the court for more than ten years. *See Society for Good Will for Retarded Children, Inc. v. Cuomo,* 572 F.Supp. 1300 (E.D.N.Y.1983); 737 F.2d 1239 (2d Cir.1984); 103 F.R.D. 168 (E.D.N.Y.1984); 832 F.2d 245 (2d Cir.1987). The court has continued to visit the institution and some of its small residential satellites, review reports of certifying agencies and of the institution, hold evidentiary hearings and discuss ongoing problems with counsel and administrative staff.

Enormous improvements in conditions at the Center have resulted from the dedicated efforts of staff; support by the state; and pressure of governmental agencies, including the courts, and counsel for both plaintiffs and defendants. Nevertheless, severe institutional problems revealed in earlier opinions continue. As reflected in the most recent hearings and reports of certifying agencies, the constitutional rights of clients to adequate physical and medical support are being violated. According to expert testimony credited by the court, there is loss of capacity in residents as a result of inadequate facilities, treatment and habilitation. The institution fails to provide reasonably safe conditions of confinement, freedom from unreasonable bodily restraints and minimally adequate training that credible expert testimony and the court find to be reasonably required. These failures constitute a violation of the rights of clients. *See Youngberg v. Romeo,* 457 U.S. 307, 327, 102 S.Ct. 2452, 2464, 73 L.Ed.2d 28 (1982) (Blackmun J., concurring) (constitution requires training "reasonably necessary to prevent a person's preexisting self-care skills from *deteriorating* because of his commitment (emphasis in original)); *Clark v. Cohen,* 794 F.2d 79, 95–96 (3d Cir.1986), *cert. denied,* 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 404 (1986); *Society for Goodwill to Retarded Children, Inc. v. Cuomo,* 737 F.2d 1239, 1250 (2d Cir.1984).

The court credits findings of various state and federal certifying agencies deter-

mining that the institution is not complying with applicable federal regulations designed to protect clients physically and medically. These expert reports are trustworthy. *See* Rule 803(8)(B), (C) of the Federal Rules of Evidence; *Beech Aircraft Corp. v. Rainey,* — U.S. —, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988). These findings confirm the evidence received in court and the court's own observations that constitutional rights to minimum housing, food, medical treatment and habilitation necessary to prevent client deterioration have not been met. In view of these findings of constitutional violations and supporting oral findings made on the record, it is not necessary to determine whether specific federal statutes are being violated.

■ It has been suggested by the Court of Appeals that prior consent by the state to a decree in this case may have constituted a waiver of its eleventh amendment immunity under *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (eleventh amendment prohibits federal courts from imposing injunctive relief against state officials for violations of state law). *See Society for Goodwill for Retarded Children, Inc. v. Cuomo,* 832 F.2d 245, 246 (2d Cir. 1987). *See also Kozlowski v. Coughlin,* 871 F.2d 241, 244 (2d Cir.1989). This court respectfully declines to follow that suggestion. As a matter of fact, no intentional waiver occurred. Implied waivers are not desirable in circumstances such as are reflected in the present litigation because they would make cooperative stipulations by the state less likely, reduce the number of consent decrees and induce litigation to the death by the defendant in an increased number of cases.

■ The plaintiffs have sought a master to supervise the institution. Such an appointment is not desirable under the circumstances of this case. The director and staff of the institution are fully committed to improvement and need no supervision. The state has been relatively forthcoming in its budgetary allocations, considering all the other fiscal demands it must meet.

■ The administrative limitations on the institution make it apparent that the constitutional rights of clients cannot be protected without further reduction of the client population. All agree that this reduction should, for generally accepted professional reasons, be accomplished by transferring as many clients as is practicable to small home-like cottages, houses and apartments; if possible these small residences should be off-campus, in the community. Community placement to the extent reasonable under the circumstances is a necessary remedial measure to vindicate the clients' constitutional entitlements. The court has the power and obligation to require remedial steps designed to overcome the effect of years of severe constitutional deprivations experienced by clients of the Center. *Cf. United States v. Paradise,* 480 U.S. 149, 107 S.Ct. 1053, 1073, 94 L.Ed.2d 203 (1987) (" 'Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.' ") (*quoting Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971); *United States v. Yonkers Bd. of Educ.,* 837 F.2d 1181, 1235–36 (2d Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988).

The following is ordered after detailed consultation on terms among counsel, administrative staff of the institution and the court:

1. The policies and actions of the defendants in the operation of the Long Island Developmental Center are declared to be in continuing violation of the plaintiff class members' rights under the due process and equal protection clauses of the Fourteenth Amendment.

2. Defendants shall implement the following plan at LIDC (including the Sagtikos and Sagamore units):

GOAL I: To Assure Proper Programming, Particularly for those Over the Age of 21 Not Educated in the Public School System

| OBJECTIVE | ACTIONS |
|---|---|
| 1. To reorganize the delivery of treatment services so that it more effectively develops the client in his environment of Long Island Developmental Center, and in a more normalizing manner provides better staffing coverage and consistency in the delivery of clinical services. | 1.a) Refine program curricula utilizing new and age appropriate technologies.<br><br>b) Develop the necessary training and support systems to facilitate achieving the objective. |
| 2. To improve the existing goal oriented programming for residents over the age of 21. | 1. By September 1, 1989, reassess existing programs of the over age 21 population to determine if they are meeting individual client needs and where they are not, revise curricula to encompass the whole client and improve his skills in real life. This reassessment shall be a continuing requirement.<br><br>2.a) An upwardly mobile continuum of services will be developed to provide training to clients having from the least to the greatest abilities. This continuum will begin with basic living skills (including grooming, toileting, eating), and move into more advanced living skills (such as domestic activities). The next step will focus on the development of prevocational skills (e.g., motor development, coordination, and vocational readiness) and terminate in vocational habilitation (including such activities as landscaping assistance, housekeeping assistance, etc.). Throughout the entire continuum, attention will be paid to socialization and deinstitutionalization.<br><br>b) By July 31, 1989, Program Center(s) will be designed to modify maladaptive behaviors which would prohibit clients from progressing through the programming continuum and may inhibit eventual placement provided that the establishment of such center(s) shall not reduce the level of care provided to other clients below the minimum levels required under this decree. There is no requirement that persons with the same problems be grouped together. The techniques to be used are within the discretion of professional staff. |
| 3. Provide goal oriented programming to all residents age 21 and under. | 1. By July 31, 1989, all residents age 21 and under shall receive school edu- |

4. Improve upon existing systems to assure that clients of Long Island Developmental Center receive programs that meet their needs.

1. By September 1, 1989, on a five day per week 12 month per year basis, six hours of active, structured programming shall be made available to each client in addition to recreation and leisure activities unless medically, socially or psychologically contraindicated as shown by the certification of a QMRP (Qualified Mental Retardation Practitioner) having a State certificate, but lack of resources shall not be the basis for such certification; provided, however, that each client has the right, after being fully advised, to refuse any such programming. The professional staff may define structured programming to include equivalent programming in non-classroom or equivalent settings. In each case a member of the professional staff must certify on the client's record why the variation is required. Compliance with § 483.440 of 42 C.F.R. shall be deemed sufficient compliance with this requirement.

2. Develop a training program to facilitate the success of program philosophy and goals.

3. Make more meaningful a quality assurance system that will assure clients are receiving programs which best meet their demonstrated needs and evaluate their mobility or fixation at an appropriate level; e.g. assuming no inhibiting neurological impairment client program will be altered if it is not successfully addressing a lack of toileting skills.

4. By September 1, 1989, an appropriate toilet training program shall be made available to all clients not presently toilet trained, unless such program is medically or physiologically contraindicated as shown by the certification of a QMRP (Qualified Mental Retardation Practitioner) having a State certificate.

GOAL II: An Increased Direct Care Staff Ratio at the Ward Level and Dormitory Care Level, as well as in Various Professional Specialties

| OBJECTIVE | ACTIONS |
| --- | --- |
| 1. To maintain an overall staff to client ratio of no less than 2 to 1 and allow for various administrative flexibilities and prerogatives, until March 31, 1992. | 1. An overall staff to client ratio of no less than 2 to 1 shall be met and maintained within 1%. To meet this objective, the Director shall have the authority and be required |

*cation programming on a full year (12–month) basis.*

to fill and refill any vacant position without regard to any budgetary restrictions or other limitations, unless otherwise ordered by the Court.

2. On an as needed basis, increase the fill level in selected direct care and clinical care titles and/or lay off in titles determined to be in excess and redeploy these resources to functional areas to augment services, within a 10% variation on fill levels, subject to the provisions of statute and collective bargaining agreements.

2. To increase direct care staff available in the ward at times of maximum activity.

1. Review all direct care assignments and, based on proposed program changes, develop a correct distribution for each client area for each shift, subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected unions and employees.

2. Continually review and readjust direct care assignments and schedule based upon client needs, program, and residential goals, subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected union and employees.

3. Utilize staff from areas vacated by clients going to day program to assist in other direct care or program areas, subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected unions and employees.

4. Request that OMRDD assess the current utilization of housekeeping personnel with an eye toward increasing their effectiveness on the living unit, thereby increasing direct care staff availability to clients. Assessment should include the use of part-time, flex-time, and other alternate work schedules when filling housekeeping vacancies, subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected unions and employees.

5. Utilize the incontinent pads or disposable diapers to free direct care staff from the "folding and sorting" activity or provide additional staff to fold cloth diapers.

6. With such training as is required, food service personnel will more actively participate in meal time programming and thereby supplement direct care staff involvement, subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected unions and employees.

7. Increase volunteer programs and encourage older parents and members of the community to become Foster Grandparents or Senior Companions.

8. Reinforce performance standards and, through the performance evaluation system, reinforce direct care responsibilities to client assignments, subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of unions and employees.

9. Restructure current performance evaluations to continue to reinforce supervisory responsibilities of mid-level supervisors and nurse administrators in supervising direct care to insure maximum utilization of therapy aides, subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected unions and employees.

4. To increase the provision of needed clinical support services to clients.

1. Cluster professional personnel in relation to client needs as reflected by client abilities grouping.

2. Continually review the utilization and need for specific clinical titles. Adjust clinical assignments and/or employment levels as required by changing client needs.

3. The assignment of clinician duties will place a priority on service delivery as opposed to record keeping; and this will be documented through the performance evaluation system.

4. Expand performance standards and review the organizational placement of discipline coordinators.

5. Expand performance standards for clinical personnel to include the training and supervision of direct care staff, on all shifts, in the program skills and activities.

6. Seek the involvement of professional schools by providing clinical field experience at Long Island Developmental Center campus.

7. Where vacancies in professional staff have not been filled after good faith efforts to do so, equivalent personnel shall be made available by contracting for part-time services and other devices not inconsistent with statute or collective bargaining agreements, and funds may be shifted from line budget items for this purpose.

8. Continue the planning for, and expedite the development of, training programs for high school and undergraduate students giving them the opportunity to work part time at Long Island Developmental Center during peak client activity times, subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected unions and employees.

GOAL III: Develop an Improved Training Program for Those Charged With Care of Clients so That Necessary Program Activities Are Incorporated in the Context of Clients' Daily Living

| OBJECTIVE | ACTIONS |
|---|---|
| 1. To increase the relevancy of training for staff charged with care of clients. | 1. Establish a residential training program under a centralized unit headed by a Director of Training to be utilized for assessing staff competencies, training, and for field placement of students from academic institutions. |
| | 2. Utilizing adult-learning theory, this unit will increase efforts to provide total competency-based training by: |
| | a) Identifying basic and site specific competencies expected in job performance. |
| | b) Developing realistic assessment methods. |
| | c) Having staff who demonstrate competency in any conceptual or skill area exempted from training in that content area. Life safety skills will be assessed every six months and retraining required as indicated by skill assessment, within applicable federal and state regulations. |
| | d) Revising present curricula and developing new ones as necessary to reflect changing client needs to assure relevancy of training. |
| | e) Incorporating evaluations of training into the curriculum revision process. |
| | 3. Funds shall be available to permit contracts for outside consultants to train Long Island DDSO trainers |

when changing client needs require staff training beyond the scope of the expertise of employees.

4. Utilizing affirmative action practices, staff above-named training unit with a team of employees who demonstrate the ability to provide client care meeting all applicable standards, and can serve as a model for training and retraining.

5. Establish an "Ad Hoc" training advisory committee with representation from Staff Development and Training, LIDC Client Services, state-operated community-based services, voluntary agencies, public relations, certification unit, all labor organizations, and the Society for Good Will to Retarded Children, Inc. This committee will provide input into the planning, implementation, and evaluation of training.

6. Revise the training delivery model to include the appropriate use of:
   a) Onsite, hands on, experiential learning.
   b) Role modeling in the training unit utilizing a "buddy system."
   c) Centralized classroom learning.

7. Expand the training of client care work teams from residential units and program areas in team process, communication skills, awareness, and continuity of client care by integrating direct care staff of all three shifts, mid-level supervisors, professional staff, treatment team leader, parents and support service personnel.

2. To expand the availability of training opportunities for staff.

1. Expand the pool of trainers by:

   a) Establishing a mechanism for sharing training resources within OMRDD.
   b) Developing a training consortium with voluntary agencies in the Long Island DDSO catchment area.
   c) Utilizing more parents and guardians of clients in training programs.

2.a) Continue to negotiate academic credit (extending beyond life-experience credit) for training received at Long Island Developmental Center.
   b) Negotiate increased numbers of university affiliations for:
   —Student field placement at Long Island Developmental Center in exchange for academic faculty offer-

ing staff training at Long Island Developmental Center.

—Academic programs (degree and certificate bearing) at Long Island Developmental Center.

3. To increase the application of knowledge and skills acquired through training to job performance.

1. Establish a mechanism for evaluating the effectiveness of training and application on-the-job in both residential and treatment areas which feeds back to Staff Development and Training Department to be utilized in revising training programs. The evaluation process will include both trainees and supervisors.

## GOAL IV: Proper Repairs to Buildings, Particularly as to Heating and Air Conditioning

| OBJECTIVE | ACTIONS |
|---|---|
| 1. To reorganize the delivery of maintenance and environmental services. | 1. Organize the Maintenance Department under the supervision of a plant superintendent to be responsible for all maintenance and environmental services. |
| 2. To reduce the number of repairs required. | 1. Continue the maintenance assistant repair concept of performing comprehensive repairs on a scheduled basis and preventive maintenance of non-specialized equipment. |
| 3. To improve the quality and quantity of work production. | 1. Develop and implement a formal training program for maintenance and environmental systems staff. |
| | 2. Negotiate with BOCES and private trade schools the use of Long Island Developmental Center as a practical training site for their students (with particular emphasis toward affirmative action programming), and arrange for slots in those schools for selected Long Island Developmental Center Plant Engineering staff to learn new skills or upgrade present ones. |
| | 3. Contract with private tradesmen to perform specific maintenance and environmental systems functions, subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected unions and employees. |
| | 4. Change existing staff pass days and work hours by introducing flextime, subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected unions and employees. This would result in greater maintenance coverage over an expanded workday. Maintain this action on a continuing basis. |
| | 5. On or before June 1, 1989, an additional fund of up to $35,000 shall |

be established to hire as temporary civil service summer employees (high school and college students and selected clients) to function as helpers for grounds, maintenance and environmental systems assistance, subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected unions and employees. Maintain this action on a continuing basis.

6. Utilize a facility-wide "long-term leave pool," subject to the provisions of statute and collective bargaining agreements, unless modified by the consent of affected unions and employees.

4. To improve the responsiveness and efficiency of Work Control.

1. Establish realistic in-service training for supervisory personnel, specific to job title.

2. Formulate for shop distribution, a plant engineering parts catalog, which will allow for faster identification of parts that must be ordered. Maintain this action on a continuing basis.

3. Increase the minimum and maximum stock levels, especially for those specialty parts that are difficult to locate or have manufactured. Maintain this action on a continuing basis.

4. Purchase appropriate equipment (to include those that save labor and manpower) and parts to make proper repairs.

5. Clearly identify capital construction issues, e.g. roofing, fail safe valves and systems, heating, and air conditioning, for inclusion in capital budget request so that this major, time consuming work is not handled by local staff, by default. Fail safe valves and systems must be installed and operational on or before July 31, 1989.

5. To improve environmental conditions in all buildings at the facility.

1. All buildings must meet federal ICF/MR standards of safety and habitability, and shall be made fully safe and habitable including repairs of all leaky roofs, broken or missing windows, full operation of all air conditioning units, heating systems and other known problems with the physical plant.

6. To expand utilization of existing rest and recreational facilities.

1. Assign project to Quality of Work Life Committee to determine what additional facilities are required and can be developed within exist-

ing resources. (Subdivisions client and staff, C & S).

a) Subdivision C (Client) will utilize parent participation to plan for additional client lounges and family visitation areas.

b) Subdivision S (Staff) will utilize union and management participation to develop staff lounges, activity center(s), and quiet areas for personnel.

c) Subdivision C & S (Client & Staff) will combine to formulate plans to develop the grounds of Long Island Developmental Center to meet environmental needs and to stimulate the increased use of outdoor areas for client programming and recreation.

2. Expand Volunteer Services capabilities to enlist aid from local schools, fraternities, scouting organizations, civic and other groups, to aid in grounds beautification projects and to provide outdoor recreation areas, and other improvements.

GOAL V: Every Client Is Provided, as Required, Adequate Prosthetic Devices; Special Clothing Where Required; Specialty Designed Wheelchairs and Carts Where Required, and Sufficient Numbers of Vehicles to Transport Them; and Furniture Necessary and Appropriate for Clients

| OBJECTIVE | ACTIONS |
|---|---|
| 1. To refine the existing system to further ensure clients' needs are met. | 1. Screen and monitor, through reports by staff and visitors and a computerized reporting system, clients at least semi-annually to determine continued appropriateness of special furniture, clothing, wheelchairs, and adaptive devices. |
| | 2. Recruit additional qualified professionals needed to deliver services to all clients with a documented need for special adaptive (physical and occupational therapy) services. |
| | 3. Properly adapted wheelchairs and sufficient special equipment shall be provided to all clients, within a 5% variation in prescription. Such equipment shall be provided to persons newly admitted to the center within six months, and six months shall be allowed for new equipment when a change in prescription occurs. This requirement shall be accomplished without regard to any obstacles. |
| | 4. Maintain adaptive equipment shops, including the supply of parts and materials, for construction of adaptive devices and special clothing. Involve skilled parents and |

guardians and other volunteers in the work of the adaptive equipment shops.

5. The facility shall have in place sufficient furniture adapted and suitable to the needs of clients; any state regulations which would impede the acquisition of such furniture are superseded.

6. Continue to attempt to develop a contract with wheelchair vendor to maintain an outlet at Long Island Developmental Center with salesperson and repairperson scheduled regularly, but failure or inability to develop such contract shall not excuse compliance with goal V, objective 1, action 3.

7. Continue to expand the appropriate utilization of clothing wardrobes in accordance with client ability.

8. All clients shall be provided with such special and other clothing and footwear as may be required by professional staff memebers, and all limitations on state purchasing of such clothing are suspended until March 31, 1992. Any clients newly admitted to the facility shall be provided with such special and other clothing and footwear within 45 days of admission.

9. Defendants shall develop an improved system for the marking and segregating of individual client clothing.

10. All clients shall be provided with such prosthetic devices including footwear as may be required by professional staff members. Any clients newly admitted to the facility shall be provided with such prosthetic devices including footwear within 90 days of admission.

2. To refine the existing transportation network for transferring clients, particularly the non-ambulatory, to all services including day program and leisure activities.

1. The facility shall provide sufficient safe and appropriate transportation to meet the programmatic and other needs of all clients, on and off the grounds of the facility.

2. The facility shall maintain its "new" ambulance and two ambulettes in good repair.

3. Revise and expand client "travel training" programs to increase clients' independence in traveling between residential and program buildings.

GOAL VI: An Increased Rate of Transfer from the Central Long Island Developmental Facilities to Residential or Other Small Community Facilities

| OBJECTIVE | ACTIONS |
|---|---|
| 1. To continue to maximize existing procedures and develop new concepts for obtaining suitable residential sites for the purpose of developing community placements. | 1. By May 17, 1989, 598 clients from Long Island Developmental Center shall have been placed in community placements, some of fifteen (15) bed size or over, but such larger size shall, however, be the exception. It is further provided that the average size of each such community residential facility shall be no more than 12. These placements shall include the development of community residences and intermediate care facilities. By March 31, 1992, the number of persons at Long Island Developmental Center campus shall not exceed 565 clients. This includes the persons in the Small Residential Units built or to be built on the campus. On a five day per week, 12 month per year basis, six hours of active, structured programming shall be made available to each client in addition to recreation and leisure activities unless medically, socially or psychologically contraindicated as shown by the certification of a QMRP (Qualified Mental Retardation Practitioner) having a State certificate, but lack of resources shall not be the basis for such certification; provided, however, that each client has the right, after being fully advised, to refuse any such programming. The professional staff may define structured programming to include equivalent programming in non-classroom or equivalent settings. In each case a member of the professional staff must certify on the client's record why the variation is required. Compliance with § 483.440 of 42 C.F.R. shall be deemed sufficient compliance with this requirement. Such clients shall also receive all medical and other support services necessary. |
| | 2. The implementation of an investor program to facilitate property lease and acquisition. |
| | 3. The construction of homes for specific populations whose needs cannot be met by existing housing stock, such as the non-ambulatory, geriatric, and sensory impaired. |
| 2. To increase recruitment efforts for family care (foster care) and personal care providers. | 1. Improve recruitment efforts utilizing such strategies as radio and TV, print media, and continuous, wide- |

3. To improve and expand the network of other than residential services to ensure that client placements are qualitatively maintained.

spread contact with charitable, religious, and service organizations to recruit potential providers of service.

1. Make available community-based day programs such as education, day treatment, and day training to accommodate the needs of the client population to be placed in the various residential programs.

2. Make available to residential providers and their clients the means to access necessary support services, with specific reference to medical and dental services.

3. Provide case management services to the client population placed on the basis of individual client need, for the purpose of monitoring the quality of that placement, and wherever necessary, provide technical assistance to the client for the purpose of accessing needed services.

4. To better utilize client need as the determinant for the type of community resource selected.

1. Expansion of the request for proposal process whereby clients are grouped according to specific representative characteristics, e.g., self-preservation, functioning level, age, in preparation for placement in community-based living situations.

2. To the extent practicable, clients to be placed in a given fiscal year are designated prior to the beginning of that year so that residential resources such as family (foster) care, personal care homes, community residences, intermediate care facilities, and skilled nursing facilities can be made available to meet client needs.

3. Defendants shall maintain continuing substantial compliance with Medicaid certification requirements in all units, buildings, and programs at LIDC, i.e., they shall meet substantially all "conditions of participation" included in 42 C.F.R. 442.483, as amended, as well as the following specific standards; these conditions and standards reflect current professional consensus on minimum standards required to protect the health of these clients who are incapable of protecting themselves; under the circumstances of this case with so many years of severe constitutional violations, the court finds they are necessary to overcome past violations:

483.410(b) — health, safety, sanitation
.420(a) — client rights
.420(c) — communication
.420(d) — abuse and neglect
.430(b) — professional program services
.430(c) — facility staffing
.430(d) — direct care staffing
.440(a) — active treatment
.440(c) — individual program plan
.440(d) — program implementation
.440(f) — program monitoring and revision
.450(b) — behavior management
.450(d) — physical restraints
.450(e) — drug therapy
.460(a) — physician services
.460(c) — nursing services
.460(e) — dental services

.460(j) — drug regimen review
.470(a) — client living environment
.470(b) — client bedrooms
.470(c) — storage space
.470(d) — client bathrooms
.470(e) — heating and ventilation
.470(g) — space and equipment
.470(h) — emergency procedures
.470(j) — fire protection
.470(k) — lead-free paint
.470($l$) — infection control
.480(b) — meal service
.480(d) — dining areas

4. Services, benefits, accommodations, and programs, including but not limited to vocational and pre-vocational programming and community placement opportunities, shall not be denied to any class member or group of class members on the basis of the nature or degree of their handicapping conditions or on the basis of generalized assumptions that they are unable to benefit from certain activities or services.

5. The preliminary injunction heretofore entered in this case on March 31, 1989 is merged into this permanent injunctive order.

6. Between May 17, 1989, and March 31, 1992, approximately 400 persons will be placed off campus in community residences of an average size of not more than 12, so that the client census at LIDC will be no more than 565 by March 31, 1992.

7. Plaintiffs' counsel and their experts shall be allowed reasonable access to all class members and their records, and to all programs, facilities, and staff members serving or accommodating such individuals.

8. Defendants shall submit to plaintiffs' counsel, within seven working days of receipt or issuance, copies of the following documents:

(a) All State or Federal statements of deficiencies, plans of correction, notifications of adverse action, and other substantive correspondence relating to Medicaid ICF/MR compliance surveys of any building, unit, or program at LIDC;

(b) Director's reports to the LIDC Board of Visitors and the minutes of Board of Visitors' meetings;

(c) Any reports of the New York State Commission on Quality of Care for the Mentally Disabled regarding any building, unit, or program at LIDC or any member of the plaintiff class, and any responses thereto or other substantive and relevant correspondence;

(d) Any reports of any other monitoring, licensing, or accrediting body regarding LIDC or any member of the class, and any responses thereto or other substantive and relevant correspondence.

9. Defendants shall report to plaintiffs and the Court on September 15, 1989, and annually thereafter, in a written format acceptable to plaintiffs, as to the defendants' compliance with each provision of the order of the Court.

10. This order shall be in effect until March 31, 1992.

11. Jurisdiction is retained over this matter until further order of the Court.

12. This constitutes a final judgment. The Clerk shall mark the case closed, subject to reopening on motion of any party.

So ordered.