Melissa HILLER, Ryan Sefton, Robert Ethridge, Robert Hogan, and Ryan Duryee, Plaintiffs,

v.

COUNTY OF SUFFOLK, Suffolk County Police Department, Police Commissioner Peter Cosgrove, Suffolk County Executive Robert Gafney, Defendants.

No. 95–CV–4496 (JS).

United States District Court, E.D. New York.

Sept. 25, 1997.

John Ray, John Ray & Associates, Miller Place, NY, for Plaintiffs.

Theodore Sklar, Deputy Suffolk County Attorney, Hauppauge, NY, for Defendants.

*MEMORANDUM AND ORDER*

SEYBERT, District Judge.

Pending before the Court is defendants' motion for summary judgment and plaintiffs'

cross-motion for summary judgment and for a hearing on damages. The genesis of this controversy began fourteen years ago, when the United States Department of Justice called into question Suffolk County's hiring practice for police officers. In the interim, Suffolk County (the "County") has attempted to address these concerns through specially designed examinations, and numerous recruitment efforts and yet, the questions remain. The discrete issue before the Court, the resolution of which will not arrest this longstanding battle for a badge, is whether one such effort went too far, and in so doing, violated the constitutional rights of other police applicants.

## BACKGROUND

On November 3, 1995, plaintiffs commenced the instant action asserting claims against the defendants for violations of 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964 and § 296 of the New York Executive Law. Specifically, plaintiffs Melissa Hiller, Ryan Sefton, Robert Etheridge, Robert Hogan and Ryan Duryee assert that they have been discriminated against on the basis of race and color as the result of an affirmative action program instituted by the Suffolk County Police Department (hereinafter "SCPD"). The challenged program is commonly known as the Suffolk County Police Cadet Program and excludes non-minorities from admission into, and the benefits of, the program in favor of black and Hispanic people.

## 1. DEPARTMENT OF JUSTICE CONSENT DECREE

In 1983, the United States of America filed an action alleging that the County was engaged in a pattern or practice of employment discrimination against women, blacks and Hispanics with respect to job opportunities in the SCPD. Specifically, the complaint alleged that just 59 of 2,580 sworn officers, or 2.3%, were Black or Hispanic and that only 25 or 0.9% were women. Exhibit C, ¶ 14, at 4.[1] The United States alleged that the County's policies and practices discriminated because (1) the County failed to "recruit, hire, assign and promote women, Blacks and Hispanics on an equal basis with white Anglo males;" (2) the standards in hiring and promoting in the SCPD have a "disproportionately adverse impact" on women, Blacks and Hispanics; (3) the County did not establish objective standards to prevent this discrimination; and (4) the County failed to take proper steps to "correct the present effects of past discriminatory policies and practices." Exhibit C at 5–6. The County answered that suit by specifically denying that it had done any of the acts alleged by the United States. Exhibit D. On September 12, 1986, the County and the United States settled the action by executing a Consent Decree entered by the Honorable Eugene H. Nickerson.[2] Exhibit E. It

---

1. References are to Exhibits annexed to the declaration of Theodore D. Sklar, attached to Defendants' Notice of Motion.

2. The 1986 Consent Decree contains a number of provisions pertinent to the instant action as summarized herein. The County expressly denied engaging in a pattern or practice of discrimination against women, blacks or Hispanics as alleged by the United States. The County did state that an inference of discrimination may arise from (1) certain of its selection criteria for hire into and assignment within the SCPD, (2) certain of the SCPD's personnel practices, and (3) the existence of a substantial disproportion between the percentages of women, blacks and Hispanics in the SCPD as compared to the percentages of women, blacks and Hispanics within the relevant labor market.

The County entered into the Decree to avoid "the burden, expense and uncertainty of further contested litigation and ... [to eliminate] any disadvantage to women, blacks and Hispanics that may have resulted from any past practice with respect to job opportunities in the SCPD." The Decree "shall constitute neither an admission by the County nor an adjudication by the Court on the merits of the allegations of the United States."

The purpose of the Decree was "to ensure that women, blacks and Hispanics are considered for employment by Suffolk County in the SCPD on an equal basis with white males, and that all employment decisions with respect to the SCPD shall be made on a non-discriminatory basis without regard to an applicant's or an employee's race, sex or national origin. In furtherance of this purpose, Suffolk County shall in good faith undertake to employ increased numbers of qualified women, blacks and Hispanics in all sworn ranks and non-sworn positions within the SCPD in accordance with their respective interest in and ability to qualify for such employment under non-discriminatory selection procedures

has been brought to the Court's attention that the Department of Justice has continued to investigate the hiring, promotion, and disciplinary practices of the SCPD.

## 2. RESULTS DESIRED WERE NOT ACHIEVED

In 1993, the SCPD concluded that despite its efforts under the 1986 Consent Decree, which included a massive recruitment effort and the administration of two open competitive examinations validated in accordance with the 1986 Consent Decree, it failed to realize a true representation of the minority community in the County. Exhibit G. In view of its conclusion that blacks and Hispanics were under-represented in the Department, the SCPD advised the Justice Department that it was creating the Cadet Program at issue here. The memorandum indicated that the program was designed to augment the diversification of the SCPD and to benefit the disadvantaged groups identified in the

and criteria." Moreover, "the achievement of this objective [would be] facilitated by a process free of unlawful barriers to entry and by a substantial increase in recruitment efforts' directed toward women, blacks and Hispanics." Additionally, the Decree provided that "Suffolk County ... shall not engage in any act or practice with respect to the recruitment or hire of applicants for employment in the SCPD, ... which has either the purpose or the effect of discriminating unlawfully on the basis of sex, race or national origin."

The parties agreed that Suffolk County would establish a new selection procedure for Police Officers that would be lawful under Title VII and that would conform to the Uniform Guidelines on Employee Selection Procedures, 28 C.F.R. § 50.14, 29 C.F.R. Pt. 1607, 31 C.F.R. § 51.53, or successor guidelines. The parties further agreed that RBH, a testing firm, would aid the County in designing new, lawful selection procedures.

Additionally, the Decree provided that Suffolk County would "immediately establish and in good faith implement during the life of the Decree a vigorous recruitment program directed at enhancing the employment opportunities of qualified female, black and Hispanic applicants for the rank of Police Officer in the SCPD. Absent explanation, it is expected that an appropriate recruitment program will attract qualified female, black and Hispanic applicants in numbers which reflect their availability in the relevant labor market."

consent decree. The Justice Department apparently did not reply.

## 3. THE CADET PROGRAM

The Police Cadet Program essentially selected black and Hispanic candidates only, who were then required to complete a two-year criminal justice degree program, tuition-free, at Suffolk County Community and to work for the SCPD in the title of Police Service Aide [3] for $10 per hour. On or about June 8, 1996, the Cadets were administered the Suffolk County Police Officer examination. Although identical in all respects to the open competitive examination for Suffolk County Police Officer given the same day, the Cadet examination was denominated a promotional examination. As per the terms of the Cadet Program, a passing grade entitles the Cadet to a "promotion" to the rank of Police Officer. This means that all qualified Police Cadets will be considered for appointment before any other candidate on the eligible list, irrespective of examination

Significantly, the decree then provided that "failure to attain a particular female, black or Hispanic applicant flow is not itself a violation of this decree." The recruitment efforts provided for in the Consent Decree included advertisements in schools, black and Hispanic communities and churches. The advertisements were (1) to emphasis that the SCPD was active in its recruitment program of women, blacks and Hispanics; (2) to emphasis that it was an Equal Employment Opportunity employer; (3) to summarize Suffolk County Police Department qualifications and various incidental information; and (4) to invite women, blacks and Hispanics to apply for Police Officer appointment. The parties expected "that an appropriate recruitment program [would] attract qualified female, black and Hispanic applicants in numbers which reflect their availability in the relevant labor market."

The United States could conduct an inquiry "as to the County's good faith implementation of the recruitment program and activities required" by the Consent Decree. The County also was entitled to move for a dissolution of the decree at any time after September 12, 1991 if it materially complied with the decree.

There was a subsequent modification to the Consent Decree in 1987 which authorized the hiring of additional Police Officers in exchange for remedial relief for unsuccessful black and Hispanic applicants of the 1984 exam.

**3.** This Order uses the terms Police Cadet and Police Service Aide interchangeably.

grade. Hartvik affidavit, ¶ 12, at 3. Accordingly, the Cadets are ensured seniority and earlier receipt of various other benefits as police officers.

There were initially 43 candidates accepted for the program, 31 sat for and passed the examination and currently 29 Police Cadets remain in the program. For reasons unrelated to this matter, no appointments have been made from either the promotional or the open competitive list for Police Officer.

### 4. THE PLAINTIFFS' APPLICATIONS

There is no dispute that each of the plaintiffs applied for the program in 1994, and it appears that all parties agree that each plaintiff was rejected because they are not black or Hispanic. The County informed each plaintiff in writing that their applications had been "reviewed with great care and, of course, complete objectivity" and that the reason for their rejection was "based on information [the applicant] supplied in the application packet and on the results of various examinations." Plaintiffs' Complaint, ¶¶ 30, 55, 79, 102, 127; see Plaintiffs' Exhibit A, attached to Plaintiffs' Memorandum of Law (a letter to plaintiff Sefton of June 1, 1994, which is identical to letters given to other Plaintiffs). None of the plaintiffs, however, were asked to submit to any examination, and obviously, the letters never mentioned that the only reason plaintiffs were rejected was because they were not black or Hispanic.

Each of the Plaintiffs filed discrimination complaints with the EEOC in 1994 and early 1995, respectively. (Plaintiffs' Complaint, paragraph 1). After receiving "Right to Sue" letters from the U.S. Justice Department, plaintiffs commenced the instant action on November 3, 1995.

### 5. SCPD'S PAST EFFORTS TO ACHIEVE DIVERSITY

Prior to creating the Cadet Program, the County had already taken significant strides towards achieving racial diversity and fully complied with the requirements of the Consent Decree, including the mandated recruitment provisions. The recruitment drive did achieve a significant increase in minority applicants, unfortunately, the ultimate results did not measure up to the efforts. Pursuant to the Consent Decree, the County retained RBH, a consulting firm, to develop, administer, and grade the 1988, 1992, and 1996 police officer examinations. In spite of these efforts, the number of minorities hired as a result of the 1988 and 1992 examinations did not significantly approach the established targets.

### DISCUSSION

Pending before the Court are motions for summary judgment by all parties. Pursuant to Federal Rule of Civil Procedure 56(c), courts may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The burden of proof is on the moving party to show that there is no genuine issue of material fact, *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223 (2d Cir. 1994) (citing *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975)), and "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987)). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A party opposing a motion for summary judgment " 'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.' " *Id.* at 248, 106 S.Ct. at 2510 (quoting *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). Under the law of the Second Circuit, "when no rational jury could find in favor of the nonmoving party because the evidence is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo,* 22 F.3d at 1224 (citing *Dister v. Continental Group,*

*Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988)). In the instant action, the parties agree that there are no material issues of fact in dispute and that the Court should decide the action as a matter of law; the Court concurs.

■ The Cadet Program, as established, constitutes de jure discrimination and is directly violative of the express terms of the 1986 Consent Decree because employment decisions were not made on a "non-discriminatory basis without regard to an applicant's or an employee's race, sex or national origin." The failure to consider non-minority applicants was an employment decision made on a discriminatory basis. The Cadet Program is a practice with respect to the recruitment or hire of applicants which has both the purpose and effect of "discriminating unlawfully on the basis of sex, race or national origin."

■ The Suffolk County Police Department Cadet Program indisputably rejected applicants based solely on the color of their skin. All racial classifications imposed by a governmental actor must be analyzed by a reviewing court under strict scrutiny. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227–29, 115 S.Ct. 2097, 2113, 132 L.Ed.2d 158 (1995). "To pass a strict scrutiny review, the government's racially motivated actions, must serve a compelling governmental interest, and must be narrowly tailored to further that interest." *Id.*

■ The Court first considers whether the Cadet Program is justified by a compelling state interest, that is, whether the County "had a strong basis in evidence for its conclusion that remedial action was necessary." *Wygant v. Jackson Board of Education*, 476 U.S. 267, 277, 106 S.Ct. 1842, 1849, 90 L.Ed.2d 260 (1986). Achieving diversity is not a sufficiently compelling state interest. *See Adarand,* 515 U.S. at 225–27, 115 S.Ct. at 2112; *Wygant*, 476 U.S. at 274, 106 S.Ct. at 1847. Rather, there must be some "showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discrimination." *Wygant*, 476 U.S. at 274, 106 S.Ct. at 1847. "The use of statistical evidence, where gross statistical

disparities can be shown, may constitute prima facie proof of a pattern or practice of discrimination, however, when special qualifications are required to fill particular jobs, comparisons to the general population may have little probative value." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 501, 109 S.Ct. 706, 726, 102 L.Ed.2d 854.

Here, however, it is not necessary for the Court to find a showing of past discrimination sufficient to satisfy a compelling governmental interest because the Cadet program is not narrowly tailored. To determine whether race conscious remedies are narrowly tailored, the Court applies the factors enunciated in *United States v. Paradise*, 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987). These include: (1) the necessity for the relief; (2) the efficacy of alternative remedies; (3) the flexibility and duration of the relief, including the availability of waiver provisions; (4) the relationship of the numerical goals to the relevant labor market; and (5) the impact of the relief on the rights of third parties. *Id.*, 480 U.S. at 171, 107 S.Ct. at 1066.

In deciding whether the Cadet Program was necessary, the Court takes notice of the good faith efforts by the County to comply with the 1986 Consent Decree, however, it also notes that the Cadet Program was a voluntary undertaking by the County. It was not established under the direction of a court order nor was it pursuant to the express terms of the Consent Decree, rather, it contravened the express terms of the Consent Decree in its attempt to satisfy the Decree's goals. Moreover, the inclusion of a college degree and part time employment as. part of the Cadet Program has not been shown to directly foster the qualifications and appointment of minorities as police officers. A college degree is not a necessary requirement for employment as a Suffolk County Police Officer.

Additionally, there is no evidence in the record to suggest that all other alternative measures were evaluated and properly passed over. The recruitment efforts succeeded in increasing the number of minority applicants and there are other remedies available to increase minority exam perfor-

mance absent an unqualified preference. The Cadet Program does not satisfy the first element of necessity, nor the second element of the efficacy of alternative remedies.

The element of flexibility considers whether a waiver exists when sufficient number of qualified minorities are not available for hire. The Police Service Aides, in passing the same examination which qualifies all candidates for consideration of appointment, met the minimal threshold, and thereby satisfied the flexibility standard. However, continuation of the Cadet Program until the goals of racial balance are achieved would constitute an unreasonable duration of at least nine years. *See Local 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 512, 106 S.Ct. 3063, 3070, 92 L.Ed.2d 405 (1986). This period would be further extended by the attrition of minority police officers and the potential that Police Cadets would not successfully complete the program.

The fourth factor is the relationship of the numerical goals to the relevant labor market. The Court finds that the statistics provided may not have accurately assessed the percentage of the labor force that would satisfy the additional qualifications needed to be appointed as a Suffolk County Police Officer, instead, the figures utilized reflected the minority percentage of the general population in the geographical areas from which the examination historically draws who were in the proper age range. There are additional educational, physical, medical, psychological and background requirements that were not considered, and therefore, the statistics provided have little probative value. Educational and sociological factors, among others, contribute to examination performance. A statistical deviation in a group's participation and success rate on an examination, does not constitute prima facie discrimination.

Finally, the impact on the rights of third parties is attenuated and diffused to a considerable extent among society generally. And although the impact is not as intrusive as a loss of an existing job, this does not rescue an otherwise unconstitutional program. In totality, a weighing of the factors dictates the conclusion that the Cadet Program was not a narrowly tailored remedy.

## CONCLUSION

As the Court finds that the Suffolk County Police Department Cadet Program discriminated on the basis of the applicants' race and did not pass the strict scrutiny test required of all racially motivated governmental programs, it is axiomatic that this discriminatory hiring practice also violates 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964 and § 296 of the New York Executive Law.

For the foregoing reasons and the reasons stated on the record, the Court denies the defendants' motion for summary judgment and grants the plaintiffs' motion for summary judgment.

The parties are ordered to brief the issue of whether, and to what extent, the plaintiffs are entitled to damages. The plaintiffs shall submit to the Court a briefing schedule in accordance with my individual rules.

SO ORDERED.