ROGERS, Circuit Judge,
concurring.
I concur entirely in the majority opinion. I write separately to acknowledge two troubling aspects of our decision, and to identify an additional consideration supporting our judgment.
Between 1972 and 1977, the City defended a lawsuit in which the Shield Club argued that the City had discriminated in its hiring, transfers, and promotions of minority police officers. The City maintained throughout that it had never discriminated against minorities. Nevertheless, after years of litigation and findings of intentional discrimination by the district judge, the City entered into a consent decree governing hiring and promotions within its police department.
In 1984, the Shield Club moved to modify and extend the consent decree. The City opposed the motion, but it ultimately agreed. A decade later, despite faithfully following the terms of the ACD, the City once again was forced to defend against allegations of racial discrimination when the appellants brought the present lawsuit in May 1994, just one month before the ACD reached its goal in June 1994. This time, however, the City was targeted not for discriminating against minorities, but for discriminating against nonminorities by following the terms of the ACD. The plaintiffs argued that the ACD should not have been extended beyond 1992, and thus that the City had been acting illegally for the subsequent year and a half in complying with the ACD.
Had this case instead been brought in 1992 to modify or terminate the consent decree, the reasoning of the majority opinion might well have supported continuation of the decree. Two factors, however, give me pause in reaching that conclusion.
First, the ACD arguably had been in place too long to be narrowly tailored. In an affirmative action plan seeking to remedy past discrimination, there are essentially three possible groups that stand to benefit: (1) those actually discriminated against, (2) those not actually discriminated against but who are members of the same group as those discriminated against and who were around at the time the discrimination took place (justifying a limited remedy of, for example, up to 10 years), and (3) other members of that group at any time (as an extreme example, 75 years after the discrimination). In this case, the minority recruits are mostly members of the third group because few of them would have been old enough to be hired as a police officer when the discrimination took place in the 1970s.
In City of Richmond v. J.A. Croson Co., the Supreme Court’s analysis brings into question whether a plan benefitting only group three survives strict scrutiny:
[T]he Richmond Plan’s waiver system focuses solely on the availability of MBE’s; there is no inquiry into whether or not the particular MBE seeking a racial preference has suffered from the effects of past discrimination by the city or prime contractors.
Given the existence of an individualized procedure, the city’s only interest in maintaining a quota system rather than *386 investigating the need for remedial action in particular cases would seem to be simple administrative convenience. But the interest in avoiding the bureaucratic effort necessary to tailor remedial relief to those who truly have suffered the effects of prior discrimination cannot justify a rigid line drawn on the basis of a suspect classification.
488 U.S. 469, 508, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (emphasis added). In addition, Justice Stevens noted:
The class of persons benefítted by the ordinance is not, however, limited to victims of such discrimination — it encompasses persons who have never been in business in Richmond as well as minority contractors who may have been guilty of discriminating against members of other minority groups. Indeed, for all the record shows, all of the minority-business enterprises that have benefited from the ordinance may be firms that have prospered notwithstanding the discriminatory conduct that may have harmed other minority firms years ago.
Id. at 515, 109 S.Ct. 706 (Stevens, J., concurring). Similarly, the minority recruits that benefítted from the ACD extension were hired even though they may have never suffered from the effects of racial discrimination. Of course, on the other hand, it is impossible to know who would have been hired under a nondiscriminatory system when, during the pendency of the consent decree, a separate remedial quota system was in place. Perhaps some of the young minority beneficiaries of the ACD in the early 1990s who would not have been hired without the ACD would have been hired had there never been any discrimination.
Second, the consent decree was open-ended depending on the actions of the City. By continually hiring fewer than seventy police officers per year, the City could have extended the ACD indefinitely. A consent decree that permits affirmative action as an ongoing option, rather than as a limited requirement, should not so easily be maintained by relying on the discriminatory situation faced at the time of the original decree. The reasonableness of the 70-per-year rule in terms of protecting minorities from city evasion of consent decree requirements does not necessarily imply that the rule is narrowly tailored for purposes of protecting the interests of nonminority applicants adversely affected by the decree.
While these considerations may in the end not have been sufficient to warrant modification of the ACD two years before it reached its goal, they at least raise serious concerns as to whether the decree continued to be narrowly tailored at that point. We do not need to resolve the issue because, in my view, a somewhat more deferential approach is required when, instead of moving to modify the decree, the officers sued after the fact for retroactive relief based on the failure of the City to violate the decree.
To award damages against the City because it failed to violate a consent decree would be troubling for a number of reasons. First, it would be inequitable to force the City to pay damages for faithfully implementing the affirmative action plan that it had challenged for years in court. The case would be different if the City entered into a consent decree that was clearly illegal at the time, or if the City subsequently ignored a new decision or statute that made it clear that its conduct was illegal. But when the City entered into the ACD, the Supreme Court had yet to announce in Croson that strict scrutiny should be used in evaluating state and local affirmative action programs. See 488 U.S. at 493-94, 109 S.Ct. 706. There is little doubt that, in 1984, the affirmative *387 action program was legal under existing caselaw. Even after United States v. Paradise, 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987), Croson, and subsequent cases were decided, it was not immediately clear that the extension of the ACD was unconstitutional.
Second, permitting retrospective relief would place parties like the City in a problematic legal position. A party is bound by a court order even if the party strongly disagrees with the order. If we award damages for failure to violate a court order, we are in some sense telling the party that it should have violated the order. Perhaps when compliance with a court order clearly violates the constitutional rights of third parties, a party should violate the order and use its legal position to defend the enforcement of contempt sanctions against it. But where the illegality of the order is not so clear, certainly a party ought to comply. This shows the respect for the system that is necessary on the part of responsible participants in our ordered republic.
Instead of violating a court order perceived to be illegal, a party should generally litigate to modify the order. One might certainly argue that the City should have sought a modification of the ACD as soon as the argument became tenable that the decree was not narrowly tailored. But such an obligation to seek to modify cannot require a litigant (here the City) to challenge a decree continuously during its pendency. Such an obligation also arguably disrespects the system, especially where the judicial order resulted from vigorous litigation, as here, and where the change in factual and legal circumstances was not clearly marked. Thus, for us to reverse the district court in this case and impose retrospective relief for failure to violate the decree, we should determine not only that the decree would properly have been modified had modification been timely sought, but also that the unconstitutional nature of compliance with the decree was sufficiently clear to the City as to require the City to have returned to court in 1992 to lift the decree. In my view, for the reasons given in the majority opinion, we cannot say that the ACD was so clearly unconstitutional as to require the City sua sponte to have sought modification in 1992, and we need not decide the closer question of whether such a modification would have been required had it been sought by the officers at the time.